## FONES v. AMERICAN SPECIALTY CO.
### No. 1979.

District Court, D. Connecticut.
Feb. 25, 1930.

Robert S. Allyn, of New York City, and Pullman & Comley, of Bridgeport, Conn., for plaintiff.

Edward K. Nicholson, of Bridgeport, Conn., for defendant.

THOMAS, District Judge.

The bill in this case charges the defendant with unfair competition and infringement of letters patent No. 1,303,161 granted to the Connecticut Telephone & Electric Company, Inc., on May 6, 1919, upon an application filed by John F. Cavanagh, on March

30, 1918, for an electric switch. Plaintiff is the Receiver in equity for said Company which will be hereafter referred to as "The Connecticut Company." The counterclaim pleaded in the answer was withdrawn during the trial.

The defenses are noninfringement and invalidity by reason of, and lack of invention over, prior patents. As a third defense, defendant contends that it was justified in making the alleged infringing devices under a certain verbal agreement between itself and the Connecticut Company, which agreement the defendant claims was broken by the plaintiff without cause.

Claims 1, 3, 4, 6, and 7 are in issue and read as follows:

"1. An electric switch comprising, a base of insulating material having a relatively deep substantially parallel-sided recess therein, a pair of normally separated contacts mounted in said recess and confined against lateral movement by the side walls of said recess, one of said contacts having a portion extending substantially transversely across the outer end of the recess, a face plate secured to said base and closing the contact-containing recess and a switch operating lever swiveled in said face plate and engaging at its inner end the transversely extending portion aforesaid of the contact for forcing said contact into engagement with the other contact.

"3. An electric switch comprising, an insulating base having a recess therein, a yielding contact mounted in said recess and having a bearing portion extending substantially across the open end of said recess, a strip of insulating material slidably resting on said bearing portion of the yielding contact and confined to said bearing portion by the adjoining walls of the recess, a second contact in the recess for engagement by said first contact, a face plate secured to the base over said recess and an operating lever swiveled in the face plate and bearing at its inner end on said slidably supported strip of insulating material.

"4. An electric switch comprising an insulating base having a recess therein, a yielding contact mounted in said recess in the base and having a bearing portion extending substantially across the open end of said recess, a strip of insulating material resting on said transversely extending bearing portion of the yielding contact, and shaped to substantially conform to the walls of the recess so as to be positioned thereby, a face plate secured to the base over said recess,

and an operating lever swiveled in the face plate and bearing at its inner end on said strip of insulating material.

"6. An electric switch comprising, a supporting base, cooperating contacts mounted on said base, one of said contacts being inherently resilient and having a laterally extending bearing portion overlying the other contact and a swiveled operating lever having a substantially conical bearing point at the inner end thereof engaging the laterally extended bearing portion of the contact aforesaid and serving to cause said lever to be snapped in opposite directions as said lever is shifted in reverse directions.

"7. In an electric switch, a pair of cooperating contacts, a switch operating lever having a ball shaped enlargement, a bearing plate having a socket in which said ball shaped enlargement is swiveled, and a bearing for said ball shaped enlargement at the back of said bearing plate."

The invention of the Cavanagh patent relates to an electric switch of the kind which consists of a supporting base of insulating material having a recess to form a housing for two contacts, the latter being attached to the inner face of the bottom of the said housing. One of these contacts is of yielding nature and has a bearing portion extending substantially transversely across the open end of the hollow base, said bearing portion being adapted to be engaged and depressed by the inner end of an operating lever. This lever has a swiveled bearing in a face plate which closes the open end of the hollow base. The flexure of the yielding contact has a tendency to cause it to "rub" against the relatively stationary contact with which it co-operates, and hence provides good, clean contact surfaces. A loose flat strip of insulating material is disposed in the housing, abutting against the yielding relatively movable spring contact. The recess in the base is so shaped that it serves as a guide for the relatively movable spring contact and also as the means which maintains the insulating strip in co-operation with the switch lever, at all times in proper relation to the relatively movable spring contact. The switch lever is held between the socket in the face plate and the insulating strip merely by the screws which hold the face plate and base together. The usual pivot pin for swiveling the lever is missing. The circuit wires are secured to the base by binding screws which screw into the rear end of rivets which serve as the means for fixing the contact springs to the switch base. The switch lever is provided at its

inner end with a conical abutment of insulating material bearing against the loose insulating strip within the switch base. By reference to figure 3 of the drawings of the patent in suit, it will be noted that the yielding end of the relatively movable switch contact is disengaged from the relatively stationary contact and that the switch lever is held in the position shown by the pressure of the said relatively movable contact against the inner end of the said lever. When the lever is swung to the opposite extreme of its movement, as illustrated in figure 2, the yielding contact is pressed into engagement with the other contact and the force of the yielding contact will, as the lever reaches dead center, snap the said lever into its extreme position. The same snap action takes place when the lever is shifted to break the circuit—the relatively movable spring contact acting in both cases in the nature of a toggle construction to snap the parts in circuit-open and circuit-closed position. The relatively movable contact also serves to hold the operating lever seated in its socket in either position and prevents the lever from rattling or working loose. In addition, the relatively movable spring contact takes up any wear that may occur between any of the parts.

■■■ Defendant's device is a Chinese copy of the device described and claimed in the patent in suit, and differs from it, only, in that its insulating base is made of two sections—and the base bottom which carries the two spring contacts is detachable from the body portion thereof. While there may be, and in fact are, certain advantages obtained by making this base of two sections, infringement is not thereby avoided because the subdivision of a part, or combining two parts into one, without change of function, is not invention. Westinghouse et al. v. New York Air-Brake Co. (C. C.) 59 F. 581; Bonnette Co. v. Koehler et al. (C. C. A.) 82 F. 428; Davis v. Perry (C. C. A.) 120 F. 941; Kalamazoo Ry. Supply Co. v. Duff Mfg. Co. (C. C. A.) 113 F. 264. . There is no question but that in defendant's device, the two elements of the base effect the same results, in substantially the same way as the one element before division. Therefore the change is merely colorable.

■■■ Defendant attempts to justify the making and selling of its devices by the fact that it had obligated itself to chain stores for a period of one year to supply the patented switches to said stores, and when in 1927 a representative of the Connecticut Company approached the various chain store buyers and offered the very same product sold by the defendant, in violation of an alleged verbal agreement with the defendant, to the chain store buyers at a lower price than the Connecticut Company was charging, the defendant was forced, after having notified the Connecticut Company of its violation of said agreement and not having received any satisfaction from the Connecticut Company, to make up enough devices of a character sufficient to satisfy the demands of the chain stores. The evidence adduced does not prove the alleged agreement, and, even if such an agreement existed, it is not and cannot be a justification for committing a tort. The motive with which infringement is committed is immaterial.

■■■ Defendant relies on two British patents and four United States patents in its attempt to prove invalidity, of the claims in issue. The two British patents, No. 1,496 of 1902, and No. 10,608 of 1896, were references cited during the prosecution of the application which resulted in the patent in suit. Both disclose switches of the type known as knife blade switches and each includes a pivoted switch blade with a separate spring cooperating therewith. United States patent, No. 485,028, granted October 25, 1892, to Binswanger, shows and describes a switch of the very same character. The United States patents, No. 623,611 to Neissner, No. 692,825 to Carliss, and No. 748,397 to Meyer, are on telephone keys—totally unlike the patented device, each disclosing a pivoted key lever and a roller or cam— but with no housing. Even if it be admitted that the telephone key patents could be combined with the search patents by substituting for the pivoted knife blades and their cooperating contact elements of the switch patents the contact elements of the telephone key patents, without the exercise of the inventive faculties, the structure so produced would not anticipate those defined by the claims in issue because none of these prior art patents describe or show the material limitations of the several claims in issue, to wit, the base of insulating material having a relatively deep substantially parallel-sided recess in which the normally separated contacts are confined against lateral movement by the side walls of the recess; nor a face plate secured to said base closing the contact containing recess and the switch operating lever swiveled in said face plate; nor a strip of insulating material slidably resting on the bearing portion of the yielding contact and

confined to said breaking portion by the adjoining walls of the recess; nor the substantially conical bearing point at the inner end of the swivel engaging the laterally extending bearing portion of the inherently resilient contact, which conical bearing point causes the lever to be snapped in opposite directions as the lever is shifted in reverse directions; nor a bearing plate having a socket in which the ball-shaped enlargement of the operating lever is swiveled, and a bearing in said ball-shaped enlargement at the back of said bearing plate. These missing elements of the prior art and their arrangement and combination undoubtedly have resulted in a structure—the low cost, simplicity, compactness and reliability of which are features which were appreciated by the purchasing and using public, so that, even if there were doubt as to the patentability of the Connecticut Company's switch, the commercial utility thereof would furnish ample testimony as to its patentability. In addition, the defendants have given the tribute of their imitation to the patented switch, defendant's device being, as above stated, a Chinese copy of the Cavanagh construction. The failure of the defendant to avail itself of the earlier devices or improve them, and the bodily appropriation of the patented structure, is most persuasive upon the question of patentability. General Electric Co. v. Wagner Electric Mfg. Co. (C. C. A.) 130 F. 772. The imitation of the thing patented by a defendant, who denies invention, has often been regarded, especially in this circuit, as conclusive evidence of what the defendant thinks of the patent, and persuasive of what the rest of the world ought to think of it. Kurtz v. Belle Hat Lining Co. (C. C. A.) 280 F. 277. Consequently I hold that all claims here in issue are valid and infringed by defendant's structure.

Plaintiff asks for treble damages because of the deliberate tort and the unfairness of the defendant as shown by the exact imitation of the Connecticut Company's switch in its minutest details of design, dimension, and color, and the deliberate procuring of plaintiff's electrotypes after the defendant had decided to make the imitation switch. In other words, plaintiff alleges that he is entitled to treble damages because of the unfair trade practices of the defendant. I think this is a question which need not be decided here but may properly be referred to the master on the accounting, with directions to consider the question and make due report and recommendation to the court.

Having found that the claims in issue are valid, and that the defendant's device infringes these claims, the plaintiff is entitled to the usual decree for an injunction, reference to a master, accounting, and costs. Submit decree accordingly.