## GILLETTE SAFETY RAZOR CO. v. HAWLEY HARDWARE CO.

### No. 2142.

District Court, D. Connecticut.

July 21, 1932.

George P. Dike, Herbert W. Kenway, and Cedric W. Porter, all of Boston, Mass. (Henry F. Parmelee, of New Haven, Conn., of counsel), for plaintiff.

John C. Kerr and Thomas J. Byrne, both of New York City, for defendant.

THOMAS, District Judge.

This is a suit brought by the plaintiff to restrain an alleged infringement of two patents, No. 1,815,745 and No. 1,633,739. The

bill as originally filed also charged infringement of reissue patent No. 17,567, but at trial this patent was withdrawn.

Patent No. 1,815,745 was issued July 21, 1931, to the plaintiff as assignee of Ralph E. Thompson for improvements in safety razors, on an application filed December 3, 1930, which was a division of the original application filed April 25, 1929, Serial No. 358,114. The other patent in suit, No. 1,633,739, was issued June 28, 1927, to Henry J. Gaisman for improvements in safety razors on an application filed November 21, 1922. Title to the Thompson patent in suit is in plaintiff by direct assignment, and title to the Gaisman patent in suit is by mesne assignments.

The bill charges the defendant with infringement as to certain safety razor blades sold by it and made by Clark Blade & Razor Company of Newark, N. J., and seeks an injunction, accounting, and damages. The defense in this case has been conducted by Clark Blade & Razor Company. So far as appears in this record, the nominal defendant, Hawley Hardware Company, never did anything more than sell a number of safety razor blades alleged to infringe the two patents in suit. The jurisdiction of this court is therefore invoked because of the facts just set forth, which show that the Clark Blade & Razor Company of Newark, N. J., is the real defendant and Hawley Hardware Company is the nominal defendant selling the product of the real defendant. Neither the nominal nor the real defendant sells or manufactures razors.

Infringement is charged of claims 1, 2, 4, 5, 7, and 8 of the Thompson patent and of claims 1 and 3 of the Gaisman patent. Of all the aforementioned claims only one, viz., claim 1 of the Gaisman patent, is for a razor blade, while all of the other claims in suit are combination claims for safety razors. The plaintiff charges defendant with direct infringement of claim 1 of the Gaisman patent, and with contributory infringement of claim 3 of said patent and of all the claims relied on in the Thompson patent.

### The Thompson Patent.

Thompson's patent discloses a safety razor which is an improvement on the so-called "Gillette type" of razor. In this type of razor a thin, flexible, and elastic blade of oblong contour with unsharpened ends, and internally apertured to receive positioning and clamping means, is removably secured in a holder which is made up of three parts, namely, a guard member, a cap, and a handle.

The guard member is adapted to support the blade adjacent to its longitudinal cutting edges. The cap is provided on opposite sides with parallel straight edges which engage the blade adjacent to the cutting edges of the latter and flex it transversely on the guard member, as a fulcrum, during the process of clamping the blade, by means of the handle, between the guard member and cap, so that when the parts are assembled, the blade is maintained in a transversely curved condition and is externally supported adjacent its cutting edges to give it rigidity. A razor of this type is described in the original Gillette patent, No. 775,134, Defendant's Exhibit A. Its commercial form, as manufactured by plaintiff, is in evidence as Plaintiff's Exhibit 9. This razor was the original Gillette and is referred to in the record as the "old style" Gillette razor. The facts stated in the specification of the patent in suit with reference to the "old style" Gillette razor are established by the evidence, and on page 1, line 26 et seq., we read:

"In the use of such a razor, satisfactory operation requires very accurate positioning of the blade edge with respect to the guard, and consequently it is extremely desirable that the parts which engage and flex the blade should retain, permanently, the precise shapes and dimensions imparted to them when manufactured. This is particularly true of the longitudinal straight edges of the blade-clamping cap, on which the alignment and amount of exposure of the blade edges depend, but inasmuch as these cap edges are necessarily made thin, in order to enable the cutting edge of the blade to reach the skin when the razor is held at the proper shaving angle, they are very easily deformed, particularly at the cap corners, to such an extent as seriously to impair the efficiency of the razor.

"For example, the mere dropping of the razor, or of the cap alone has frequently resulted in bending over a corner of the cap to an extent sufficient, when the clamping pressure is applied to the blade, to produce an uneven edge exposure or even to crack or break off a portion of the blade itself. Such a result may occur even though the bending of the cap corner is so slight that it is not likely to be noticed by the user, this being due to the fact that the pressure thereby applied to the blade tends to flex it locally in a different direction from that in which it has already been flexed by the cap as a whole, and according to a familiar geometrical principle the blade cannot be so flexed even slightly, without subjecting it to a greatly increased

stress. In such a case the user invariably considers the unsatisfactory operation of his razor to be due to a defective blade, and either continues to use the defective holder and to find fault with the blades, or else discards the razor in favor of one of another make."

This susceptibility to injury and the resulting defective operation of the razor impaired the plaintiff's business and good will. A remedy was sought unsuccessfully for a period of about ten years. For a number of years plaintiff also received complaints about the blades. To ascertain the cause of such complaints and to replace razors which had been damaged by their owners, the plaintiff, at great expense, inaugurated a series of service campaigns which consisted of sending a group of experts from city to city to hear the complaints of users of Gillette razors and to replace those which had been damaged in the hands of the users. Advertisements requesting users who were having trouble with their Gillette razors to bring them to certain designated stores were inserted in local newspapers in advance of the visits by plaintiff's representatives. As a result of these campaigns thousands of razors were returned and replaced by the plaintiff.

In May, 1921, plaintiff put on the market a new razor called the "new improved" razor, Plaintiff's Exhibit 5, which was made under the Wharton patent, No. 1,328,024, Defendant's Exhibit B. Starting at that time the caps of the razors were rounded, and later on the edges of the caps were made thicker in an endeavor to correct the defects mentioned supra. Nevertheless complaints of blade breakage increased and the plaintiff then inaugurated another service campaign. In 1928 another attempt was made to remedy the trouble. This time the distance between the two fulcrum shoulders of the "new improved" razor guard was decreased and the curvature of the cap increased so that the blade was bent less sharply when in shaving position in the razor and the strain on the blade was lessened. After this change was made the complaints of blade breakage were "not as serious as they had been but still quite serious," as appears from the testimony of both Mr. Smith, the production engineer, and Mr. McCarthy, the treasurer, of the plaintiff company.

These troubles with the razor not only injured the reputation of the razors and blades sold by the plaintiff but put it to a very heavy expense. Plaintiff spent $196,936 on the several service campaigns to replace razors that had become damaged in the hands of users

and spent considerable amounts in research from 1921 to 1929 in an effort to reduce blade breakage. It thus appears that the problem of bad shaving and blade breakage was of long standing and the solution of the trouble was difficult. Not only did the inventor Thompson make an effort to solve the problem, but others worked at it. During all of the period beginning with 1921 the witness T. L. Smith, the engineer for the plaintiff, had worked intermittently in an endeavor to discover the cause or causes of the trouble and to remedy it but all of his efforts failed. Thompson was the first and the only person to realize that the two defects of the previous Gillette razors, namely, poor shaving and blade breakage, were the result of apparently minor injuries to the cap corners. He solved this long-standing problem by making two slight changes in the razor: First, he cut out the corners of the blade so that any injury to the corners of the cap would not spring the blade out of shape and thus force the edge out of proper shaving position or cause the corners of the blade to break off; and, second, he reinforced the corners of the cap by building up a lug on the underside of each corner which fills in the cut-out corners of the blade to protect the blade and prevent injury to the cap corners. He also utilized the channels along the fulcrum shoulders described in the Wharton patent, supra, to receive the lugs on the cap corners so that the parts might not be prevented from clamping the blade along its cutting edges. In the Thompson patent in suit the cut-out corners of the blade are shown in Fig. 2 at 25, the lugs on the underside of the cap are shown best at 17 in Fig. 3, and the recesses in the guard are shown in the form of channels adjacent the fulcrum shoulders 14. In January, 1930, this new Thompson razor was put on the market. It was called the "New Gillette" razor, and specimens are in evidence as Plaintiff's Exhibit 3. Since that time the Gillette Company has not had to carry on any service campaigns and it has had few complaints and none at all regarding the "New Gillette" razor.

Claims 1 and 4 are typical of the claims in suit, and they read:

"1. A safety razor comprising a flexible and elastic blade of substantially oblong contour and internally apertured to receive positioning and clamping means, a guard member adapted to support the blade adjacent to the cutting edges of the latter, a blade clamping cap provided with parallel longitudinal edges and with reinforced corners, means for posi-

tioning the blade between the cap and the guard member, and means for clamping said parts together and simultaneously causing the longitudinal edges of the cap to flex the blade transversely on the guard member as a fulcrum the blade being provided with unsharpened ends and being cut away at each of its corners to such an extent as to span the corresponding reinforced cap corner and provide a clearance space of sufficient area to receive said cap corner if bent toward the guard member, each cap corner being located within the area of a cut away clearance space in the blade and also within the area of the guard and opposite the corners thereof, whereby a cap corner is prevented from exerting pressure on the blade while the latter is being flexed or when clamped and thereby breaking the blade or distorting its cutting edges."

"4. A safety razor comprising a transversely flexible blade having a longitudinal cutting edge terminating at each end in a recess, which recesses constitute clearance spaces to eliminate clamping pressure at such recessed ends, a blade supporting member extending lengthwise beyond the cutting edge of the blade, and a blade-clamping cap having a straight edge engaging that portion of the blade between said recesses to bend substantially the whole blade transversely upon said supporting member and having its corners provided with reinforcing lugs extending in opposed relation to and toward the blade supporting member in the clearance spaces provided by said pressure preventing recesses and terminating in close proximity to said member."

Claim 1 specifies a cap having reinforced corners and a blade cut away on each of its corners so as to span the corresponding reinforced cap corner. Claim 4 specifies substantially the same subject-matter and includes recesses in the blade at each of the cutting edges to receive the lugs on the cap.

The defenses relied on are:

A. Invalidity of the claims in view of the prior art; and

B. Noninfringement as a matter of law.

### Prior Art.

While the defendant has set up quite a number of alleged prior art patents in its answer, only four of them were referred to at trial and only one on final hearing. While, therefore, it may be unnecessary to go into the merits of those prior art patents which have been practically withdrawn by not having been referred to by defendant at final hearing, or in its brief, nevertheless I consider it better to consider all of those alleged anticipations to which defendant's expert has testified.

Particular reliance is placed on the patent to Ballreich, No. 1,246,219, issued November 13, 1917. This patent discloses a razor which is not of the Gillette type because it does not include a separate guard member and a cap between the edges of which the razor blade is clamped and by which the blade is supported adjacent its cutting edges to give rigidity to the blade. The Ballreich blade is a thick rigid blade which does not require external support, as the patent specifies on page 1, lines 21 to 24, that one of the objects of the invention is "the production of a device in which a blade is used of such thickness as not to require external support to give rigidity to its cutting edge." The Ballreich razor comprises a combined cap and guard member which contacts with only one of the faces of the blade. Consequently the blade can never be distorted by the combined cap and guard member. It follows that inasmuch as Ballreich was not faced with the problem which faced Thompson in the respect that he was never confronted with the problem of distortion or breakage of the blade by the deformation of the cap, he was not called upon to solve a problem with which he was unacquainted. True, if the Ballreich razor was dropped one of the corners of the combined cap and guard member might be bent. If it was bent away from its body portion, it would not affect the position of the cutting edge of the blade nor would it put additional stress on it. On the other hand, if the corner was bent toward its body portion, it would prevent mounting of the blade on the combined cap and guard member. The record shows that the Ballreich patent was cited against the Thompson application and fully considered by the Examiner in the Patent Office. See Plaintiff's Exhibit 24, file wrapper of the original application, Serial No. 358,-114, of which the application for the patent in suit was a division. The unbiased opinion of the expert of the Patent Office carries more weight than that of the defendant's expert whose testimony is unsatisfactory in other respects as will hereinafter appear.

The three remaining patents of the prior art are No. 850,430 to Halbekann, No. 1,579,-459 to Von Hammerstein, and No. 1,000,235 to Carreras. These need not be considered at length because defendant's expert testified that he considered the Ballreich patent to be the nearest of the prior art patents.

### The Halbekann Patent.

The Halbekann patent discloses two flat blades which are not flexed in assembling the elements of the razor. If the cap illustrated in this patent is injured, uneven exposure of the cutting edge of the blade will result. In other words, the defect of the "old style" Gillette razor which gave unsatisfactory shaving would be present. Moreover, if the Halbekann blade was of the flexible type and the razor such as would flex the blade, the latter would be apt to break.

### The Von Hammerstein Patent.

This patent discloses a triangular blade with three cutting edges separated by corner notches. Each blade edge is of a length corresponding to that of a cap edge so that the construction does not even suggest the Thompson invention.

### The Carreras Patent.

In this patent no drawings or description of the blade and its outline is shown. To form an ex post facto judgment under such circumstances, in order to invalidate a meritorious invention which has gone into extensive use as is shown by this record, goes beyond all principles of the patent law.

On the general question of anticipation by the prior art the defendant has failed to call attention to any court decision which would support its theory of unpatentability over the prior art coupled with its allegations as to mechanical skill. Having in mind the origin and development of the invention described and claimed in the patent in suit, I am of the opinion that the case at bar clearly comes within the doctrine laid down in Kulp et al. v. Bridgeport Hardware Mfg. Corporation (D. C.) 19 F. (2d) 659, where it was held that to negative invention in a novel combination, it is necessary to find in the prior art, not merely a construction which might be modified to make the patented device, but a suggestion, not only that the modification should be made, but also how to make it.

The invention described in the Thompson patent should not be held to be anticipated by one or more prior patents which do not contain even a hint from which it could be inferred that the patentees had recognized the fact that certain modifications of the structure would be necessary in order to avoid certain difficulties which the inventor of the device described in the patent in suit discovered and sought to remedy. Even if these alleged anticipating patents described the difficulties referred to, they should not be held to be sufficient to invalidate the claims because they do not suggest how to make the modification. This record shows that the problem of preventing unsatisfactory shaving and blade breakage was well recognized quite some time before Thompson's invention, and it further shows that Thompson succeeded where others had failed. The principle of law, here applicable is well stated in Acme Card System Co. v. Globe-Wernicke Co. (D. C.) 23 F. (2d) 523, at page 525, where Judge Lindley said: "We well know that, if a particular result was frequently sought and never attained, want of invention cannot be predicated upon a device or process which first reached that result, merely because the simplicity of the means appears to be such that many believe they could have readily produced it, if they had tried to do so."

This follows the well-established rule pronounced by Judge Donahue speaking for the Circuit Court of Appeals for the Sixth Circuit in Inland Mfg. Co. v. American Wood Rim Co., 14 F. (2d) 657, at page 659, where the doctrine was expressed in the following language: "It is no argument against invention that the inventor availed himself of all knowledge known to mechanics skilled in the art, nor is it surprising that, when a definite result has been accomplished, the simplicity of the methods by which it is accomplished would seem to be obvious. The line between the skilled mechanic and the ingenuity of the inventor cannot be accurately drawn in any given case, but where a demand has long existed, and men skilled in the art have sought to meet that demand without success, the argument that the methods employed by the inventor who has solved the problem are so obvious as to involve only mechanical skill, is not entitled to very serious consideration."

See, also, Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U. S. 428, 429, 434, 31 S. Ct. 444, 55 L. Ed. 527; Consolidated Brake-Shoe Co. et al. v. Detroit Steel & Spring Co. et al. (C. C.) 59 F. 902, 908; Star Brass Works v. General Electric Co. (C. C. A.) 111 F. 398, 400; American Ball Bearing Co. v. Finch (C. C. A.) 239 F. 885, 889.

Thompson discovered that there was a latent difficulty in razor construction and he located that difficulty. When the difficulty had been definitely determined and located, he then had to discover the remedy. After experiments he finally found the remedy, and he is therefore entitled to enjoy the fruits of his labors.

We have here, as I view it, a situation similar to the one which was before the Circuit

Court of Appeals for the Third Circuit in Consolidated Window Glass Co. v. Window Glass Machine Co., 261 F. 3'62, and Judge Buffington, speaking for that Court, used language especially apposite here. On page 373 of 261 F., he said: "It is to be noted that the inventions made involve, as stated by Judge Thomson in the extract quoted above, the unusual feature of first locating or discovering the difficulty to be overcome and' its relation to the whole problem, before any inventive steps were taken to solve it. In other words, these patents involve, so to speak, two series of inventions: First, discovering the difficulty; and second, discovering means to overcome that difficulty."

See, also, United Chromium v. International Silver Co. (D. C.) 53 F.(2d) 390, 391.

■ Patentable novelty is sometimes found in discovering what is the difficulty with an existing structure and what change in its elements will correct the difficulty, even though the means for introducing that element or elements into the combination are old and their adaptation to the new purpose involves no patentable novelty. Miehle Printing Press & Mfg. Co. v. Whitlock P. P. & Mfg. Co. (C. C. A.) 223 F. 647. Thompson first discovered the root of the difficulty and then discovered the remedy. The root of the difficulty was the deformation of the cap corners of the razor, and the remedy was the reinforcing lugs on the cap corners and the cut-away portions of the blade at its corners so as to prevent each of the cap corners from exerting pressure on the blade while the latter is being flexed or clamped and thus prevent breakage of the blade or the distortion of its cutting edges.

■ The law seems to be well settled that a patent does not constitute anticipation if it might, by some manipulation or alteration, accomplish a given purpose not unlike the purpose disclosed in the patent in suit after the obvious simplicity of the patent itself becomes apparent. This rule has been stated by the Supreme Court of the United States in Expanded Metal Co. v. Bradford, 214 U. S. 366, at page 381, 29 S. Ct. 652, 655, 53 L. Ed. 1034, where Mr. Justice Day, speaking for that court said: "It is often difficult to determine whether a given improvement is a mere mechanical advance, or the result of the exercise of the creative faculty amounting to a meritorious invention. The fact that the invention seems simple after it is made does not determine the question; if this were the rule, many of the most beneficial patents would be stricken down. It may be safely said that if those skilled in the mechanical arts are working in a given field, and have failed, after repeated efforts, to discover a certain new and useful improvement, that he who first makes the discovery has done more than make the obvious improvement which would suggest itself to a mechanic skilled in the art, and is entitled to protection as an inventor. There is nothing in the prior art that suggests the combined operation of the Golding patent in suit. It is perfectly well settled that a new combination of elements, old in themselves, but which produce a new and useful result, entitles the inventor to the protection of a patent. Webster Loom Co. v. Higgins, 105 U. S. 580–591, 26 L. Ed. 1177–1181."

■ When it is sought to ascertain the state of the art by means of prior patents, nothing can be used except what is disclosed on the face of those patents. Such patents cannot be reconstructed in the light of the invention in suit and then used as a part of the prior art. Naylor v. Alsop Process Co., 168 F. 911, 920 (Circuit Court of Appeals, 8th Circuit). That, however, is precisely what the defendant attempts to do in this case in respect to the Thompson patent, but the courts do not allow such a doctrine to prevail. In view of the rules and decisions applicable, I must hold that the prior art patents in evidence do not and cannot vitiate the patent to Thompson who assigned the same to the plaintiff.

At the final hearing of this case defendant introduced in evidence as Defendant's Exhibit EE a copy of the decision of the Board of Appeals of the Patent Office in Interference No. 60,845, together with the file wrapper of an application for letters patent, Serial No. 409,636, filed by Henry J. Gaisman on November 25, 1929, Defendant's Exhibit CC. It appears that the original application filed by Thompson on April 25, 1929, Serial No. 358,114, was in interference with applications filed by others, including the Gaisman application, supra, and that the subject-matter involved in said interference was:

"1. As a new article of manufacture, a razor blade of the Gillette type internally apertured to receive positioning means and requiring external support on both sides for its cutting edge and of substantially uniform thickness and flexibility between its internal apertures and the cutting edges, said blade having reentrant recesses located in its corner portions providing clearance spaces of sufficient area to prevent clamping pressure by the corners of a blade holder, each recess having its inner corner curved in concave

contour to avoid excessive stress concentration adjacent to the perimeter of the recess.

"2. As a new article of manufacture, an elastic, transversely-flexible razor blade adapted for use in existing Gillette type of safety razors, said blade having unsharpened ends and being internally apertured to receive positioning and clamping means, and being also provided with reentrant recesses located at its corner portions respectively and each extending both longitudinally and transversely of the blade to such an extent as to span the adjacent corner of the blade-clamping cap when assembled therewith, and provide a clearance space of sufficient area to receive a cap corner if bent, whereby said blade while being flexed or when clamped is relieved of the possibility of pressure from a bent cap corner, each of said recesses having an inner concave fillet shaped to prevent excessive stress concentration thereat."

The Board of Appeals of the Patent Office, in a decision handed down on or about March 14, 1932, held the two counts quoted, supra, to be nonpatentable over the Ballreich patent heretofore discussed at some length, and it is now the defendant's contention that in view of this decision plaintiff has no standing in this court as far as the Thompson patent in suit is concerned for the reason that it intends to prevent, under the doctrine of contributory infringement, the manufacture by defendant of certain blades which the Patent Office held to be unpatentable.

It appears from Plaintiff's Exhibit 8, which is a letter from the Clark Blade & Razor Company to its jobbers, that the blade manufactured by Clark and alleged to infringe the Thompson patent in suit was made especially for the purpose of fitting the Gillette razors, including those manufactured under the Thompson patent in suit. The claims in suit having been held to be valid, and contributory infringement being intentional aid or cooperation in transactions which, collectively, constitute complete infringement, provided the part furnished be an element of the patented combination, it follows that it is no defense to contributory infringement that the part furnished is not patented or even unpatentable. Defendant alleges that the plaintiff acquiesced in the decision of the Board of Appeals of the Patent Office which held the two counts of the interference above quoted to be unpatentable. This is denied by the plaintiff, and attention is directed to the fact that no appeal can be taken from the decision of the Board at such a stage of the proceedings and that an appeal will be taken in due time when the matter has ceased to be interlocutory.

From what has been said supra with regard to the merits of the Thompson invention, it follows not only that the two counts of the interference above quoted are patentable over the prior art, including the patent to Ballreich, but also that the claims proposed in said interference by Gaisman are patentable over the prior art, so that defendant's contention as to the untenable position of plaintiff in striving to obtain a patent for a razor blade having cut-out corners by either Thompson or Gaisman, I conclude, is without force, particularly when it is considered that interference proceedings in the Patent Office are very common. In my opinion there seems to be no inconsistency in plaintiff's conduct in having the question of priority of invention between two of its assignees determined by the Patent Office.

## B. Noninfringement as Matter of Law.

Defendant's contention that as a matter of law the sale of razor blades, regardless of their type or character and irrespective of their adaptability for use with Gillette razors, cannot constitute contributory infringement, applies to both the Thompson and Gaisman patents in suit. In order to intelligently deal with this question it is necessary to first consider the Gaisman patent in suit.

### The Gaisman Patent.

This patent also describes a safety razor of the "Gillette type." Prior to the patentee's invention, that is, prior to 1922, these razors were so constructed that one of the clamping members, that is to say, either the guard member or the cap, was provided with blade positioning elements—for instance pins, which were designed to project through holes in the blade and into holes in the other clamping member, whereby the blade and the clamping member were maintained in shaving relation. For example, in the "old style" Gillette razor, Plaintiff's Exhibit 9, there are two pins on the underside of the cap which pass through two holes in the blade and project through corresponding holes in the guard member. From the underside of the cap there also extends a screw-threaded spindle which passes through a hole in the blade and through a corresponding hole in the guard member. This spindle, however, has no function in positioning the blade. Its sole purpose is to engage the handle of the razor for clamping together the cap, the blade, and the guard member. In this old construction the blade

has no function whatever in positioning the clamping members in relation to one another. The object of the Gaisman invention is stated to be to provide a safety razor wherein the blade co-operates with the guard member to retain the blade in shaving relation thereto, and the blade also co-operates with the cap to retain the latter in proper relation to the blade for shaving purposes, so that the position of the cap with regard to the guard member is maintained by the blade and not by the co-operation of the guard member and cap as is the case in the "old type" Gillette razor. In carrying out the invention, the guard member and the blade have co-operating means to retain the blade in shaving relation on the guard member. This means is in the form of a noncircular projection 1b on the guard member adapted to enter a noncircular opening 2a in the blade. This opening is centrally disposed in the blade. The cap is provided with projections or pins 6 on its underface which are adapted to enter recesses or notches 2b in the blade ends whereby the blade retains the cap in operative relation to the blade and to the guard member. The pins 6 do not engage the guard member. In addition, the cap is provided with a screw-threaded spindle 4 which passes through the blade and through an opening in the guard projection 1b for engagement with the handle 5 of the razor. The screw-threaded spindle and handle serve to clamp together the cap, blade, and guard member. As will be seen from the foregoing, the blade constitutes the connecting link between the cap and guard member, that is, when the blade is removed from the razor, the cap and guard member are adapted to move in relation to one another both longitudinally and transversely. However, when the blade is interposed between the cap and guard member it aligns the cap and guard member. In the "old style" Gillette razor the coacting pins on the cap and holes in the guard member maintain these two elements in shaving relation even if the blade is removed from the razor.

It appears from the record that the distance at which the cutting edge of a blade projects beyond the cap and guard member must be kept within certain limits. If the cutting edge projects beyond the cap and guard member more than $\frac{8}{1000}$ (.008) of an inch, the user is apt to cut himself. If the blade does not project far enough, it is difficult or even impossible to shave with the razor. It is desirable to maintain blade exposure to $\frac{4}{1000}$ (.004) of an inch.

In order to maintain the blade exposure within the limits specified, the blade positioning means of the razor and the cap and guard member aligning means must, obviously, be made with predetermined accuracy, as only certain clearances and manufacturing tolerances are permissible. The sizes of the pins on the underface of the cap of the "old style" Gillette razor are maintained within certain specified limits, and so are the sizes of the diameters of the holes in the blade and in the guard member. The clearances, when the parts are assembled, are the free spaces between the sides of the pins and the holes in the blade or in the guard member. The sizes mentioned above must be made so accurately that the total accumulated errors in manufacture will not exceed $\frac{8}{1000}$ (.008) of an inch. It is thus apparent that an accumulated error of $\frac{8}{1000}$ (.008) of an inch which is divided between the various elements of the razor demands great accuracy in manufacture, and it is correspondingly true that costs of manufacture increase rapidly as standards of accuracy are raised.

The principal utility of the Gaisman invention lies in the fact that it permits less accurate standards of manufacture while maintaining equal accuracy of positioning the cutting edges of the blade with relation to the cap and guard member of the razor. The accumulated error which is possible in the Gaisman razor is less than the accumulated error of the "old style" Gillette razor. It appears from the evidence that the Gaisman principle reduces the variation of the blade cutting edge exposure approximately one-third or, if the same tolerance and clearances are maintained, the Gaisman principle improves the average qualities of the razor by about one third.

Plaintiff's witness T. L. Smith, the production engineer, testified that the greater the tolerance, the lower the cost, and that the greater the precision required, the greater is the cost of manufacture. If the tolerances are reduced one-third, the costs would perhaps be doubled (pages 310, 311), and there is no controversion of this testimony in the record. Therefore the effect of the Gaisman invention is either to permit manufacture with less accurate measurements of a razor which will shave satisfactorily or, if the same accuracy is maintained, to produce a more accurate, and therefore a better, shaving instrument.

The invention described and claimed in the Gaisman patent in suit is in a modified form employed in plaintiff's so-called "Good Will" razor, Plaintiff's Exhibit 4. In these razors the guard member is provided with

two spaced apart projections instead of the single central projection 1b of the patent, and the notches or cut-out corners of the blade take the place of the notches 2b in the ends of the blade shown in Fig. 7. The function and operation of the elements of the "Good Will" razors are the same as those of the Gaisman patent in suit. Of the so-called "Good Will" razors the plaintiff has sold many millions. The cost of manufacture is comparatively low because greater tolerances and clearances are permissible without sacrificing the shaving qualities of the razor.

The defenses are:

C. Invalidity of the claims in view of the prior art;

D. The defendant's razor blades do not embody the alleged combination of claim 1 in suit;

E. If claim 1 is construed to cover defendant's blade, it is invalid in view of the prior art;

F. Claim 3 is not infringed as a matter of law. Claims 1 and 3 read:

"1. A blade having a non-circular opening substantially centrally disposed to retain the blade in shaving relation to a guard member, said blade having means spaced from said opening to cooperate with a clamping member to retain the latter in shaving relation to the blade independent of the guard member."

"3. A safety razor comprising blade clamping members, a blade, means cooperative between one of said members and said blade to retain the latter in shaving relation to said member, said blade and the other member having cooperative means whereby the blade will retain said member in an operative position respecting the blade, and means to detachably clamp the blade between said members."

### C. The Prior Art.

While quite a number of alleged prior art patents have been pleaded by defendant, only four of the same received attention at trial, so this discussion will be limited to the four patents discussed by Mr. Campfield, defendant's expert whose testimony was not directed to the facts. The four patents to be considered are as follows:

1. To Clark, No. 933,020, issued August 31, 1909.

2. To Nahemow, No. 952,837, issued March 22, 1910.

3. To Leslie, No. 1,272,816, issued July 16, 1918.

4. To Gaisman, No. 1,011,938, issued December 19, 1911.

The questions presented, so far as the four prior art patents are concerned, are exceedingly simple and they may be resolved into two: First, do the four prior art patents, either singly or in combination, disclose a safety razor in which a cap is free to move relative to the guard when the blade is removed from the razor? Second, do these prior art patents describe or illustrate a blade of the "Gillette type" which forms the connecting link beween the guard member and cap? The answers to these questions must be in the negative, as will be shown by a discussion of the patents.

### The Clark Patent No. 933,020.

This patent shows a razor of the "Gillette" type with a positive connection between the cap and the guard member. From the blade contacting face of the guard extends a projection 15 adapted to enter a perforation 14 in the blade and recesses 21 in the cap. Therefore the cap is positively positioned with relation to the guard just as the cap in the "old style" Gillette razor is positioned by its pins with reference to the guard. This razor is exactly like the "old style" Gillette. It does not embody the Gaisman invention. It accumulates the manufacturing errors and it fails to eliminate them.

### The Nahemow Patent No. 952,837.

This patent also shows a razor of the old "Gillette type." The guard is made of two pieces which are adjustable to vary its width. The cap has a screw-threaded shank 20 which is provided with an enlarged angular head 21 at its inner end to fit the opening 15 in the guard and the central angular opening in the blade marked 26. All that has been said about the Clark patent applies also to this patent.

### The Leslie Patent No. 1,272,816.

Defendant's expert relies particularly on this patent. It discloses a razor which is provided with two blades both of which are flat and, as stated in the specification, "thin yet stiff." The claims, too, call for "a substantially non-flexible blade." It must be remembered that Gaisman provides a flexible blade in contrast to the nonflexible blade shown and described in the Leslie patent, in which patent the cap is positioned by the guard and the blade has nothing whatever to do with the positioning of the cap in relation to the guard.

### The Prior Gaisman Patent, No. 1,011,938.

This patent discloses a blade having three polygonal openings corresponding to the three openings of the "old style" Gillette blade. No mention whatever is made in this patent of the features which are characteristic of and described and claimed in the Gaisman patent in suit. Hence I conclude that the prior art cited and relied upon by defendant cannot invalidate claims 1 and 4 of the Gaisman patent in suit.

### The Canadian Judgment.

Subsequent to the final hearing, defendant filed with the court a certified copy of an opinion rendered by the Exchequer Court of Canada on May 27, 1932, in a suit brought for the infringement of a Canadian patent by Gillette Safety Razor Company of Canada, Limited, v. Pal Blade Corporation, Limited, and Metropolitan Stores, Limited, alleging that the Canadian suit was founded on the Canadian patent corresponding to the Gaisman patent involved in the case at bar. It appears from this judgment that claim 4 of the Canadian patent is the same as claim 1 of the Gaisman patent in suit and that claim 4 was held invalid by Judge MacLean. There is nothing, however, in this record or in anything submitted after final hearing which shows that the Canadian case was presented and considered by the court upon the same record as the one which has been made in the case at bar. In any event, even though we indulge in the violent presumption that the record there was the same as the record here, I should not feel inclined to surrender my own judgment and the conclusions herein reached and stated upon the issues herein presented. If the record there was the same as the record here, I should, with all due respect for the judgment of the Canadian court, dissent from the opinion filed by Judge MacLean. Comity is not a rule of law, but one of practice, convenience, and expediency. It requires of no court to abdicate its individual judgment, and is applicable only where, in its own mind, there may be a doubt as to the soundness of its views. This principle is clearly stated by Mr. Justice Brown in Mast, Foos & Co. v. Stover Manufacturing Co., 177 U. S. 485, at page 488, 20 S. Ct. 708, 710, 44 L. Ed. 856, where he said: "Comity persuades; but it does not command. It declares not how a case shall be decided, but how it may with propriety be decided. It recognizes the fact that the primary duty of every court is to dispose of cases according to the law and the facts; in a word, to decide them right. In doing so, the judge is bound to determine them according to his own convictions. If he be clear in those convictions, he should follow them. It is only in cases where, in his own mind, there may be a doubt as to the soundness of his views that comity comes in play and suggests a uniformity of ruling to avoid confusion, until a higher court has settled the law. It demands of no one that he shall abdicate his individual judgment, but only that deference shall be paid to the judgments of other co-ordinate tribunals. Clearly it applies only to questions which have been actually decided, and which arose under the same facts."

### D. Defendant's Blades Do Not Embody Combination of Claim 1.

As a further defense it is urged by the defendant that its razor blades, Plaintiff's Exhibit 6, neither embody the structure defined in claim 1 of the Gaisman patent nor perform the function specified therein. This contention is based, as I view it, upon a complete misunderstanding of the Gaisman patent by defendant's expert and on the wrong assumption that Plaintiff's Exhibit 3, bar type razor, is made in accordance with the Gaisman patent in suit. As appears very clearly from plaintiff's proofs, it is its own good will razor, Plaintiff's Exhibit 4, which is constructed according to the teachings of the Gaisman patent.

Claim 1 of the Gaisman patent specifies:

1. "A non-circular opening substantially centrally disposed" having the function of retaining the blade in shaving relation to a guard member; and

2. "Means spaced from said opening," that is, the recesses or notches 2b in the ends of the blade, the function of which is "to cooperate with a clamping member (the cap) to retain the latter (the cap) in shaving relation to the blade independent of the guard member."

In other words, this claim covers a razor blade having two characteristics—one of which is a central opening for positioning the blade on the guard member, and the other the notches in the ends of the blade to locate the cap on the blade. Defendant's Clark Ace blade, Plaintiff's Exhibit 6, embodies the two essential elements of claim 1 and has their functions. The Ace blade has a noncircular opening in the form of a slot which is centrally disposed in the blade in the respect

that it is located in the longitudinal axis of the blade. This slot serves to retain the blade in shaving relation to the guard member as may be readily ascertained by placing the blade on the guard of a good will razor, Plaintiff's Exhibit 4. It also has "means" (the notches or recesses in the four corners of the blade) "spaced from said opening," and these notches "cooperate with a clamping member (the cap) to retain the latter in shaving relation to the blade independent of the guard member," as may be readily seen by mounting the blade on the cap of a good will razor, Plaintiff's Exhibit 4. An inspection of the good will razor with a Clark Ace blade mounted thereon clearly discloses the fact that the blade forms the connecting link between the cap and the guard member, which otherwise are free to move both longitudinally and laterally with respect to each other.

Defendant argues that its Clark Ace blade does not include a noncircular opening substantially centrally disposed to retain the blade in shaving relation to the guard member, because the guard members of the Gillette good will razors are not provided with any projection whatsoever upon which the noncircular centrally disposed (square) opening of the defendant's blade can fit, and that there are no projections on the cap of the Gillette good will razor which could be construed as a substitute or equivalent of the diamond shaped snugly fitting projection 1b of the Gaisman patent. There is no merit in this contention. The Gillette good will razor has two diamond-shaped projections on its guard which fit into the centrally disposed noncircular slot in the Clark Ace blade and thereby retain the blade in shaving relation to the guard member.

Defendant further argues that the parts of the razor of the Gaisman patent in suit are not "in shaving relation" until the handle has been screwed down and has caused the cap and the guard member to flex and then clamp the blade between them. This argument is based upon a misunderstanding of the term "shaving relation." When the parts of the Gaisman razor are assembled with the blade between them, and before the handle is screwed down to clamp the parts together, the blade is in shaving relation with respect to the guard member and the cap is in shaving relation to the blade independent of the guard member. The parts, however, are not in shaving position, meaning thereby that the blade has not yet been flexed. Inasmuch as the claim does not call for shaving position,

but only for shaving relation, it is evident that defendant's argument is not well taken.

In view of the foregoing, I conclude and hold that Plaintiff's Exhibit 6, Clark Ace blades, infringe claim 1 of the Gaisman patent in suit.

### E. If Claim 1 is Construed to Cover Defendant's Blade, it is Invalid in View of the Prior Art.

As a further defense it is asserted by defendant that if claim 1 of the Gaisman patent in suit is construed to cover defendant's blade, it is invalid in view of the prior art. All the argument on this point is based upon the fact that some of the prior art patents show noncircular centrally disposed positioning openings and on the assumption that the noncircular positioning opening in the Gaisman blade does not retain the blade in shaving relation to a guard member, and on the further allegation that notches or recesses in blades are old for co-operation with one of the clamping members of a razor.

It appears from the discussion of the prior art, supra, that the blades disclosed in the patents relied on by the defendant do not and cannot function in the manner called for by claim 1 of the Gaisman patent in suit. It is also apparent that the noncircular central opening in the Gaisman blade has the function of retaining the blade in shaving relation to a guard member. Nevertheless, even if every element of the combination defined by claim 1 of the Gaisman patent was old, the claim would be valid because it is a general rule that a patentable invention may consist entirely in a new combination or arrangement of old and well-known elements or ingredients provided a new and useful result is thereby attained. Inasmuch as the result obtained by Gaisman is new and useful, it follows that claim 1 is valid. This doctrine is clearly stated by Judge Thayer, speaking for the Circuit Court of Appeals, Eighth Circuit, in Fairbanks, Morse & Co. v. Stickney, 123 F. 79, at page 82, where he said: "Even if it be conceded that the individual elements composing the combination are to be found in the prior art, yet, to make the selection of these parts from the prior art, and to combine them, as Hobart did, so as to produce a clutch which is at the same time, simple, compact, effective, and useful, required, as we think, more than ordinary mechanical skill."

■ It is not of consequence that the elements of each claim may be old, for the claims are

for a combination, and if the combination is new, or if by a new method of organization new or better results are obtained, the patent may be sustained. Dunn Mfg. Co. v. Standard Computing Scale Co., 163 F. 521 (Circuit Court of Appeals, Sixth Circuit); Davis v. Perry (C. C. A.) 120 F. 941; Brown v. Huntington Piano Co. (C. C. A.) 134 F. 735; Hobbs Mfg. Co. v. Gooding (C. C. A.) 111 F. 403, 406; Dececo Co. v. George E. Gilchrist Co. (C. C. A.) 125 F. 293, 298, 299; Western Electric Co. v. North Electric Co. (C. C. A.) 135 F. 79, 89; Sanders v. Hancock (C. C. A.) 128 F. 424, 433, 434.

■ The fact that all of the elements of a combination may be found in the prior art and apparently in combination in the claims of prior patents does not anticipate unless, when read in connection with the specification of the patent in suit, the structure and function of the invention appears. Warren Steam Pump Co. v. Blake & Knowles Steam Pump Works, 163 F. 263 (Circuit Court of Appeals, First Circuit). For the reasons given I conclude that the defenses interposed cannot prevail.

### B and F. Noninfringement as Matter of Law.

We now come to the question of infringement and contributory infringement. As to both patents in suit defendant takes the position that the sale of razor blades, whatever their type or character and regardless of their adaptability for use with plaintiff's razors, does not constitute contributory infringement of the claims of the patents in suit in view of the decision of the Supreme Court of the United States in Wilson v. Simpson et al., 9 How. 109, 13 L. Ed. 66, and the subsequent decisions by the lower courts down to and including the very recent case of American Safety Razor Corporation v. Frings Bros. Co. (D. C.) 56 F.(2d) 449. On the other hand, plaintiff argues that the case at bar is outside of the scope of Wilson v. Simpson, pointing out that the doctrine enunciated in that case is as much the law to-day as it was when decided and that subsequent decisions have not broadened it in the least. The plaintiff further asserts that defendant can only prevail on this defense in case the decision in Wilson v. Simpson is broadened to cover something which it was not intended to cover.

At argument and in the brief plaintiff directs attention to a general distinction between Wilson v. Simpson and the case at bar. The Supreme Court was there considering the Woodworth patent, which disclosed a planing machine used in the lumber business which was equipped with knives for the planers and cutters with which to cut the tongue and groove in boards. The knives are rapidly dulled by use but can be restored by grinding. Naturally, continued use and grinding gradually consume the knives and cutters. The Woodworth machine as a whole would last for several years, but the cutting knives wear out and require replacement every sixty or ninety days. The plaintiff sought an injunction to prevent defendant from using the machine in which it had replaced worn-out cutters, but the Supreme Court held that the defendant had the right to replace the cutters in its machine when they were worn out. In the case at bar the plaintiff asserts that the scope of that decision turns on the meaning to be given to the phrase "worn out." Plaintiff has introduced evidence to show that the blades of the Thompson and Gaisman razors disclosed in the patent in suit are not worn out within the meaning of the decision in Wilson v. Simpson. Defendant, on the other hand, contends that its blades stand in the same position as the knives and cutters stand in relation to the other elements which make up the planing machine in Wilson v. Simpson, and that they are worn out when discarded by the user.

■ As I view the law governing contributory infringement by the renewal of parts in a patented machine as stated by the Supreme Court, the purchaser of a patented machine has a license to preserve its fitness for use so far as it may be affected by wear or breakage, and that beyond this there is no license. The true test seems to be whether or not the element to be replaced is worn out or consumed in the ordinary use of the machine. Six times did Judge Wayne use the phrase "worn out" to express the condition precedent to the replacement of the cutters. That this must be so is shown by six quotations from the opinion. On page 123 of 9 How., 13 L. Ed. 66, he said: "Illustrations of this will occur to any one, from the frequent repairs of many machines for agricultural purposes. Also from the repair and replacement of broken or worn-out parts of larger and more complex combinations for manufactures." And again on page 124 of 9 How., 13 L. Ed. 66: "The complaint now is, that the defendants, in the use of their old machines, have replaced new cutters for those which were worn out, in fraud of the ruling of this court in its answer to the first point certified when this case was formerly here." And he

further says on page 125 of 9 How., 13 L. Ed. 66: "But it does comprehend and permit the re-supply of the effective ultimate tool of the invention, which is liable to be often worn out or to become inoperative for its intended effect, which the inventor contemplated would have to be frequently replaced anew, during the time that the machine, as a whole, might last." Continuing Judge Wayne said: "The proof in the case is, that one of Woodworth's machines, properly made, will last in use for several years, but that its cutting-knives will wear out and must be replaced at least every sixty or ninety days." And on page 125 of 9 How., 13 L. Ed. 66, this further use of the words "worn out" appears: " *   *   *  Or before that part of it had been worn out." And finally on the same page we find this: " *   *   *  The other constituent parts of this invention, though liable to be worn out, are not made with reference to any use of them which will require them to be replaced."

Subsequent decisions of the Supreme Court as well as all inferior courts confirm, as I conclude and without any doubt, this interpretation of Wilson v. Simpson. In Cotton-Tie Co. v. Simmons, 106 U. S. 89, 1 S. Ct. 52, 27 L. Ed. 79, Judge Blatchford said on page 94 of 106 U. S., 1 S. Ct. 52, 57, 27 L. Ed. 79: "The case is not like putting new cutters into a planing-machine, as in Wilson v. Simpson, 9 How. 109 [13 L. Ed. 66], in place of cutters worn out by use. The principle of that case was, that temporary parts wearing out in a machine might be replaced to preserve the machine, in accordance with the intention of the vendor, without amounting to a reconstruction of the machine."

In Leeds & Catlin v. Victor Talking Machine Co., 213 U. S. 325, 29 S. Ct. 503, 506, 53 L. Ed. 816, Mr. Justice McKenna, referring to Wilson v. Simpson, said on page 336 of 213 U. S., 29 S. Ct. 503, 53 L. Ed. 816: "Can petitioner find justification under the right of repair and replacement as described in Wilson v. Simpson, 9 How. 109, 13 L. Ed. 66, and Chaffee v. Boston Belting Co., 22 How. 217, 16 L. Ed. 240? The court of appeals, in passing on these cases, considered that there was no essential difference between the meaning of the words 'repair and replacement.' That they both meant restoration of worn-out parts. This distinction was recognized in Wilson v. Simpson."

In Morgan Envelope Co. v. Albany Perforated Wrapping Paper Co., 152 U. S. 425, 14 S. Ct. 627, 38 L. Ed. 500, Mr. Justice Brown, referring to the doctrine of Wilson v. Simpson, on page 434 of 152 U. S., 14 S. Ct. 627, 631, 38 L. Ed. 500, said: "It was proved that one of the machines would last in use for several years, but that its cutting knives would wear out, and must be replaced at least every 60 or 90 days."

The evidence in this record shows that razor blades do not actually "wear out" to such an extent that they cannot, by stropping and occasional grinding or sharpening, be restored to an indefinite period of usefulness and that the needs for blades arises, not because they are "worn out," but because it is much more convenient to buy them than it is to strop and occasionally sharpen and grind them plus the further fact that the small cost of the blades allows most users to consult their comfort, convenience, and their ideas of economy. For the reasons given I conclude that the doctrine enunciated in Wilson v. Simpson is not applicable to the case at bar and that the use of defendant's blades in the patented combination of either the Thompson or Gaisman patents in suit constitutes contributory infringement. It is to be noted that the evidence shows that the blades charged to infringe were made and sold for the purpose of fitting plaintiff's patented combination.

In the Cotton-Tie Case, supra, the owner of patents for improvements in metallic cotton bale ties—each tie consisting of a buckle and a band—granted no license to manufacture the ties, but supplied the market with them and stamped in the metal of the buckle the words, "Licensed to use once only." After the bands had been severed at the cotton mill, the defendant, who bought them and the buckle as scrap iron, rolled and straightened the pieces of the bands and riveted their ends together. He then cut them into proper lengths and sold them with the buckles to be used as ties and nothing was done to the buckles. In finding infringement, Mr. Justice Blatchford had this to say on pages 93 and 94 of 106 U. S., 1 S. Ct. 52, 56, 27 L. Ed. 79: "Whatever right the defendants could acquire to the use of the old buckle, they acquired no right to combine it with a substantially new band, to make a cotton-bale tie. They so combined it when they combined it with a band made of the pieces of the old band in the way described. What the defendants did in piecing together the pieces of the old band was not a repair of the band or the tie, in any proper sense. The band was voluntarily severed by the consumer at the cotton-mill because the tie

had performed its function of confining the bale of cotton in its transit from the plantation or the press to the mill. Its capacity for use as a tie was voluntarily destroyed. As it left the bale it could not be used again as a tie. As a tie the defendants reconstructed it, although they used the old buckle without repairing that. The case is not like putting new cutters into a planing-machine, as in Wilson v. Simpson, 9 How. 109 [13 L. Ed. 66], in place of cutters worn out by use."

It is thus clear that this decision not only adheres to the doctrine of Wilson v. Simpson, but that it does not enlarge it.

Defendant calls attention to American Safety Razor Corporation v. Frings Bros. Co. (D. C.) 56 F. (2d) 449, which deals with patents relating to safety razors and safety razor blades and in which the question of contributory infringement was considered by Judge Kirkpatrick and relies upon it in support of its contentions. After reading the same, I conclude that the case there does not bind us here because it appears that the facts presented in that case and this case are different and so can have no controlling force here. All the other decisions cited and relied upon by the defendant are not in point, because the decisions subsequent to Wilson v. Simpson lay down the rule that only perishable and worn-out elements of a patented combination may be replaced by the user.

The record further shows that neither the nominal defendant, Hawley Hardware Company, nor the real defendant, Clark Blade & Razor Company are users of the patented combination within the meaning of the law. The Hawley Company is a jobber and sells razor blades indiscriminately to the public regardless of the reasons for purchase. Clark Blade & Razor Company is a manufacturer supplying the blades to jobbers and dealers. The distinction between users on the one hand, and manufacturers or jobbers on the other, has been made by Judge Nields in Cinema Patents Co. v. Craft Film Laboratories (D. C.) 56 F. (2d) 265, who pointed out on page 268, of 56 F. (2d), that: "This suit should be distinguished from a somewhat similar line of cases, where suits are brought for contributory infringement. There the defendant manufactures one or more of the elements of some patented device for the trade. He wholly ignores the patent and the rights of the holder of the patent. He claims immunity because he is manufacturing and selling parts to those who may be purchasers of a patented machine to enable them to replace parts worn out or destroyed. Courts

are prone to hold such a manufacturer to a strict account. If he proves that he manufactured to fill the present need of a particular purchaser of patented machines to replace parts worn out or destroyed, he stands in the same position as the purchaser."

In the case at bar the defendant has no proof that it sold "to fill the present need of a particular purchaser * * * to replace the parts worn out or destroyed." On the contrary, the evidence shows that the defendant sells blades indiscriminately without ascertaining whether they are to replace blades worn out or destroyed.

The decision in the Cinema Patents Case, supra, is in line with the decision in Shickle, Harrison & Howard Iron Co. v. St. Louis Car-Coupler Co., 77 F. 739 (Circuit Court of Appeals, Eighth Circuit); National Malleable Casting Co. v. American Steel Foundries (C. C.) 182 F. 626, 641; Thomson-Houston Electric Co. v. Ohio Brass Co., 80 F. 712 (Circuit Court of Appeals, Sixth Circuit). In the Shickle Case, Judge Thayer, speaking for the Circuit Court of Appeals, on page 743 of 77 F., said: "The knuckle of the complainant's car coupler is shown to be less durable than the drawheads, but no more essential to the successful operation of the coupling apparatus. The knuckle is not claimed separately, and is not in itself a patented article. It follows, we think, that, within the rule which is deducible from the cases last cited, a person who purchases one of the patent car couplers thereby acquires the right to replace a knuckle which happens to be broken, provided the drawheads still remain serviceable. To that end, we think that a purchaser may either manufacture a knuckle, or procure some one else to manufacture it for his use. It must be borne in mind, however, that the right to manufacture and sell the knuckle in question should be confined strictly within the limits last stated. We would not be understood as deciding that the defendant company has the right to manufacture the knuckles which form a part of the complainant's device, and to sell them indiscriminately to all persons who see fit to buy them; for, clearly, such is not the law."

In National Malleable Casting Co. v. American Steel Foundries, supra, Judge Rellstab said on page 641 of 182 F.: "This right is for the purpose of maintaining the patented article in the service intended by its purchase, and not to obtain duplicates. The right of one, other than the patentee, furnishing repair parts of a patented combination,

can be no greater than that of the user, and he is bound to see that no other use of such parts is made than that authorized by the user's license. Thomson-Houston Elec. Co. v. Ohio Brass Co. et al., 80 F. 712, 26 C. C. A. 107. If it is necessary to facilitate the movement of cars that the railroads be permitted to so substitute locks with attached links, though only the link is defective, and for such purpose to keep on hand at different points a stock of such locks with attached links—and this would seem to be necessary—such locks should be obtained from the complainant. This requirement would protect the patentee in his monopoly without injury to the purchasers' license to repair, for the latter would still have the right to repair the parts thus substituted."

In Thomson-Houston Electric Co. v. Ohio Brass Co., supra, Judge Taft, speaking for the Circuit Court of Appeals, Sixth Circuit, on pages 723 and 724 of 80 F., said: "It being established that defendant is offering for sale articles, intending them to be used in combinations which, if unlicensed by complainant, would be infringements of complainant's patents, we think that it is the duty of the defendant to see to it that such combinations which it is intentionally inducing and promoting shall be confined to those which may be lawfully organized. We are unable to see why any different rule should be applied in such a case from that applicable to a case in which a defendant makes a patented machine to order. He may make such a machine upon the order of the patentee or a licensee, but not otherwise. Upon him is the peril of a mistake as to the lawful authority of him who gives the order. So, he may knowingly assist in assembling, repairing, and renewing a patented combination by furnishing some of the needed parts; but, when he does so, he must ascertain, if he would escape liability for infringement, that the one buying and using them for this purpose has a license, express or implied, to do so. What we have said has application only to cases in which it affirmatively appears that the alleged infringer is offering the parts with the purpose that they shall be used in the patented combination. We have found that it does so appear here, and is a matter of

certain inference from the circumstance that the parts sold can only be used in the combinations patented. Of course, such an inference could not be drawn had the articles, the sale or offering of which was the subject of complaint, been adapted to other uses than in the patented combination. In the latter case the intention to assist in infringement must be otherwise shown affirmatively, and cannot be inferred from the mere fact that the articles are in fact used in the patented combinations or may be so used. * * * But, where the article can only be used in a patented combination, the inference of the intention of the maker and seller is certain, and the right of the patentee to injunction ought, we think, to be equally certain."

For all the foregoing reasons and cases supporting my conclusion I hold that the defendant is a contributory infringer of the Thompson and Gaisman patents in suit.

### Recapitulation.

The matters to be determined in this case may be epitomized in three questions. They are:

1. Are the Thompson and Gaisman patents valid?

2. Are the defendant's blades, Plaintiff's Exhibit 6, infringements of claim 1 of the Gaisman patent in suit?

3. Are the defendant's blades, Plaintiff's Exhibit 6, contributory infringements of the claims relied on in the Thompson patent and of claim 3 of the Gaisman patent?

For the reasons given and upon the authority of the cases cited and quoted from, all three questions are answered in the affirmative.

Having thus expressed my conclusions, it follows that claims 1, 2, 4, 5, 7, and 8 of the Thompson patent, and claims 1 and 3 of the Gaisman patent relied upon as covering defendant's blades are valid and infringed. It follows therefore that there may be a decree for the plaintiff in accordance with the prayer for relief with costs to abide the event.

Submit decree accordingly properly consented to as to form.