ANDERSON & WRITER CORPORATION v.
HANKY BERET, Inc., et al.

District Court, S. D. New York. November 11, 1929.

Kenyon & Kenyon, of New York City (William Houston Kenyon and William Houston Kenyon, Jr., both of New York City, of counsel), for plaintiff.

O. Ellery Edwards, of New York City, for defendants.

WOOLSEY, District Judge. ▮ I find the plaintiff's patent No. 1,725,500 valid, that claims 7–11 thereof are infringed by the defendants, and I grant the preliminary injunction pendente lite for which the plaintiff prays.

The motion to dismiss the bill of complaint is denied.

I. Patent No. 1,725,500, which will hereinafter be referred to as the Writer patent, was applied for on November 23, 1928, as a tam-pressing machine. The patent was granted on August 20, 1929, as United States patent No. 1,725,500.

The plaintiff corporation was incorporated under the laws of New York on November 26, 1928, and the patent in suit was duly assigned to it on September 10, 1929.

The defendant corporation Hanky Beret, Inc. was incorporated by the defendant Tannenbaum on April 25, 1929.

Prior to that time the defendant Tannen-baum and a man named Miller had been doing business under the name and style of Petite Hat Company, under a certificate filed on June 28, 1928.

The defendant Morris Stafford was an expert machinist who was in the employ of the plaintiff until about April 13, 1929. About that time he was lured away from the plaintiff's employ by the defendant Tannenbaum, and the affidavits satisfy me that when he left he secretly took with him two typical upper dies of the plaintiff's machine.

II. Some time during the summer of 1928 Victor P. Writer, to whom the patent in suit was granted, and who had been engaged for some years in the making of hats, went to work to see if he could evolve a machine which would expeditiously make a beret or tam out of a single piece of felt cloth or other material.

The method by which he arrived at the machine for which he secured the patent in suit is explained fully in his second affidavit verified October 3, 1929.

His first full-sized machine was put into operation in July, 1928. In November, 1928, he and Henry Anderson, who also had been in the hat-making business, formed the Anderson & Writer Corporation and began business together. By that time eight machines were operating in Writer's place of business.

When the Anderson & Writer Corporation was formed Writer transferred to it these eight machines and his right of invention, for which he had filed a patent application, as above noted, on November 23, 1928.

Anderson for a period of many years had been engaged with his father under the name of Joseph Anderson & Company, Inc., in making ladies' hats. He had used the trade-mark "Hanky Felt" or "Hanky" on all the products which his former company had sold. When the Anderson & Writer Corporation was formed, and succeeded to the business of Joseph Anderson & Co., Inc., in December, 1928, the trade-marks of Joseph Anderson & Co., Inc., of "Hanky Felt" and "Hanky," as used on all kinds of women's hats, were transferred and conveyed to the Anderson & Writer Corporation.

Thus in combining Anderson brought in certain trade-marks, and Writer brought in his machines, and, when the plaintiff began to manufacture women's berets, it sold them under the name of "Hanky Beret." This name was written in characteristic script on the labels of its hats and in its advertising.

The plaintiff's business grew with the most remarkable rapidity. Commencing in February, 1929, when it got into commercial

production with 5,621 berets, its monthly production figures had increased almost steadily to 73,944 in August, 1929.

The Writer patent is described as a tam-pressing machine.

The subject-matter of the Writer patent, on which this complaint is based, as stated in the specifications, relates chiefly to a method and a machine for blocking and pressing tams or berets for girls.

The general description of the invention is as follows: "The invention proposes the use of a press having a spring holding disc connected with a foot pedal for assuming various positions, and springs connected with the disc and with a movable die engageable in a stationary cup-shaped die. Use is also made of a circular plate with a radial slot made of flexible material such as spring steel for receiving the tam goods which is spread over one side and the edges then pulled thru a central aperture in the movable die. The said movable die may be provided with heating elements and the tam goods must be in a wetted condition when worked upon."

The claims principally relied on by the plaintiff as to which it claims the infringement is clear, in which I agree, are claims 7 to 11, inclusive.

Claim No. 7 is a method or process claim and reads as follows: "7. The method of producing tam-o'-shanters or the like from a sheet of material, comprising the steps of folding the outer portions of the material inwardly toward its center and holding the marginal edge of the folded material against contraction, pulling the free inner end of the material inwardly from the marginal edge, and subjecting the folded material to the action of pressure in the presence of heat and moisture."

Claims 8, 9, 10, and 11 are for patents on the machine, and 11 is broader than the three preceding claims, as it is not limited to the presence of a flange on the lower die referred to in claims 8, 9, and 10.

Claim 8, which is typical of claims 9 and 10, reads as follows: "8. A machine for making tam-o'-shanters or the like, comprising a lower die having a base and an upstanding flange defining the effective area of the base, an upper die for movement within the flange of the lower die and having an opening extending there-through and spaced from its outer marginal edge, a separate shaping element adapted for insertion within the flange of the lower die and adapted to have the material of the article folded over the same and serving to hold the marginal edge of the material against contraction, the opening in the upper die affording access to the free inner end of the material whereby it may be pulled inwardly from the marginal edge, means to effect a relative closing movement between the dies, and means to heat one die."

Claim 11 reads as follows: "In a machine for making tam-o'-shanters or the like, a lower die, an upper die for co-action therewith and having an opening formed there-through and spaced from its marginal edge, a shaping element to be removably mounted between said dies and adapted to have the material of the article folded about the same, said shaping element having a diameter approximating that of the upper die whereby the outer edge of the shaping element is disposed adjacent to the outer edge of the upper die and remote from the opening of the upper die, the opening in the upper die affording access to the free inner edge of the material for pulling action, means to heat one die, and means to effect a relative closing movement between the dies."

The essential novelty and the reason for the success of the Writer machine is that the cloth when pulled through the upper die, over the flat metal plate or forming disc is free to move in any direction, and, when a wetted cloth is in use, it can stretch, not merely radially over the forming disc, but in any other direction in which its texture tends to yield. Thus an interplay of stretching, expansion, and contraction, when the cloth dries, is permitted with these forces acting at angles across each other to the substantial and permanent rearrangement of the set of the fabric.

The wrinkles which are drawn through the opening in the upper die are eventually eliminated by cutting them off by hand, and the result is a perfectly smooth beret.

The furtive enthusiasm with which Tannenbaum and his subsequently formed Company received the plaintiff's invention as a contribution to beret manufacturing is the best possible tribute to the novelty and value of the plaintiff's process and machine. Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U. S. 428, 435, 440, 31 S. Ct. 444, 55 L. Ed. 527; Kurtz v. Belle Hat Lining Co. (C. C. A.) 280 F. 277, 281. It showed an instantaneous recognition by a practical man, of experience in his business, that here was a new and extraordinarily useful machine for making berets or tams.

When Tannenbaum states in his affidavits that he did not know about plaintiff's machine when he built the machines which he used, and which are almost precisely like the plaintiff's, he is, in my opinion, guilty of the

414

most barefaced perjury. It certainly does not lie in his mouth, or in the mouth of Stafford, to dispute the novelty and value of the plaintiff's invention when together they have paid to it the two sincerest compliments which man can pay—larceny and imitation.

Apparently it was perfectly obvious to the defendants' counsel from the first that there was not any question about the infringement, if the patents were valid, and that, as to the equities, there could not be any argument whatever in the defendants' favor. If this was his point of view, he was quite right.

The point which the defendants' counsel has, therefore, sought to stress throughout the argument is that there were earlier patents than the plaintiff's which indicated that there was not any novelty in the plaintiff's invention.

The one prior patent, however, on which the defendant has focussed was patent No. 1,530,001, issued to one Isidor Kiwad, which throughout the argument was, and will be hereafter referred to as, the Kiwad patent. This patent defendants claim disclosed the same principle which the plaintiff's invention disclosed. I do not agree.

The Kiwad patent is for a "Hat Die."

The subject-matter of the Kiwad patent was thus stated: "This invention relates to hat making and forming machines and more particularly to a novel and improved method of shaping the material to produce what is known in the art as a bell crown, cushion brim hat."

The claims of the Kiwad patent, with significant parts italicized for convenience, are as follows:

"1. A hat forming machine of the class described comprising a support having a removable steam pot, a moisture separating paddle within the pot, a die having an insert seated on the top of the said steam pot, a *split ring and adjustable ring clamping elements on the die and the insert to grip the material folded over said ring,* a removable hat size former adapted to be placed on the die, said former having a slightly enlarged depending portion extending within the die, pins on the top edge of the former for securing the material folded over the ring clamping elements, radially adjustable lever operated means movable over the size former for *stretching* the secured material and spring controlled plunger operating means movable through the size former into the body of the die to expand the material to conform to the shape of the die.

"2. A hat forming machine of the class described comprising a support having a removable steam pot, a moisture separating element within the said pot, a die for said steam pot, a removable insert for said die, a *split ring and ring clamping elements on the die and the insert to grip the material folded over said ring,* a hat size former partly depending in the die, a flange on said former for maintaining the same on the die, *vertically movable means operable over the size former for stretching the material to form the hat brim* and plunger operating means carried by the last mentioned means for stretching the material placed within the die.

"3. A hat forming machine of the class described comprising a support having a removable steam pot, a moisture separating element within the pot, a removable die and a removable insert for the die, a *split ring and adjustable ring clamping elements on the die and the insert to grip the material folded over said ring,* a hat size former adapted to be placed on the die and to extend partly within the same, *means for securing the material to be formed on the top of the size former,* lever operated means for stretching and expanding the material *secured by the clamps and the size former,* and plunger operating means movable through the size former into the body of the die to stretch the material to conform to the shape of the die."

I find that the Kiwad patent did not anticipate the process claimed in Writer claim No. 7 or the Writer machine for which claim is made in Writer claims Nos. 8–11 inclusive. The structures are different. The purpose of Kiwad patent was different, the method followed in using the Kiwad machine was different, and the result was different.

The contention frequently repeated by the defendant's counsel that the forming ring in the Kiwad patent was similar in function to the forming disc in this case involves disregarding all that is said of the forming ring in the specifications and claims of the Kiwad patent. The contention flies in the face of language which is perfectly clear.

The object of that ring and its accompanying clamps was to hold the cloth firmly at its periphery on the ring whilst the stretching of the material above the ring occurred. This is shown in the Kiwad patent specifications in line 70 on page 1, in lines 57–75 and 90–100 on page 2, in lines 1–12 on page 3; and in the Kiwad patent claims in lines 5–8, 25–27, and 40–50 on page 4.

Apparently realizing the weakness of his position on its original affidavits, the defendants' counsel has tried to mend his hold, and, after I had had this matter under considera-

tion for some time, secured leave to file further affidavits. He claimed that he showed by those affidavits that the defendants had made experiments and had succeeded in making a device which was like the Kiwad patent, but was not like the Writer patent, and at the same time performed the same functions as the Writer patent.

What was done was to make an upper die like the die of the Writer patent with a single modification—that it had a contact or pressure ring of a radial width of about 9/16 of an inch depressed below the surrounding surface of the die about 5/32 of an inch.

This it is claimed is the equivalent of the stretching ring in the Kiwad patent, and that the newly formed device of Tannenbaum's is a device which does not infringe the Writer patent.

The effect of this change is merely to narrow the part of the upper die which is pressed on to the fabric in the area where the wrinkles or puckers appeared, namely, towards the center of the forming disc. Added to the forming disc is a device which Tannenbaum had started to use before the argument, namely, a flat cylinder or turret arranged centering in the middle of the forming disc.

The essence, as I have pointed out above, of the Writer patent is the free movement of the fabric pulled over a metal forming disc. That is not the Kiwad patent, but it is involved in the device which the defendants in their eleventh hour experiment have made.

This latest attempt by the defendants to change the device is such an obvious distortion of the Kiwad claims as to be wholly unpersuasive that a prior art was disclosed by that patent. Cf. Metropolitan Device Corp. v. Williamsburg Electric Supply Co. (C. C. A.) 19 F.(2d) 442, 447; Black v. Nathan Anklet Support Co., Inc. (C. C. A.) 9 F. (2d) 311, 312; United Shirt & Collar Co. v. Beattie (C. C. A.) 149 F. 736, 739.

III. The history of the infringement as shown by the affidavits is substantially as follows:

The defendant Tannenbaum seems to have been making berets by a very different method until the time hereinafter mentioned when he found out about Writer's invention and at once adopted it. Indeed Tannenbaum admits that it was not until March, 1929, that he made any one-piece berets by any method, and then he made them with model forms on which he shrunk them.

It was not until the latter part of April, 1929, that the defendant succeeded in making a commercial success of the manufacture of berets.

This date is significant for reasons which will be hereinafter explained.

Apparently some time in the early part of March or April, 1929, Tannenbaum heard in the trade of the one-piece beret which the plaintiff was making, and during the month of April he approached a man named Sol Farber, who was a salesman for one Jacob Ratner. Ratner was a dealer in felt who had sold felt both to the plaintiff corporation and to the Petite Hat Company—the trade-name of Tannenbaum—and also, before the organization of the plaintiff company, to Victor P. Writer, the inventor of the patent in suit.

Farber was acquainted with Writer, Anderson, and Tannenbaum, and he had often seen the tam-pressing machine which Writer was operating at his factory at 25 West Thirtieth street, and had achieved considerable familiarity with it.

In April—probably in early April—although Farber does not know the exact date, a message came to him that Tannenbaum wanted to see him. He went to 46 Great Jones street where Tannenbaum's business— under the name of the Petite Hat Company —was maintained, and talked with Tannenbaum.

Tannenbaum there told him that he understood that he (Farber) knew all about Writer's tam-pressing machine; that he wanted Farber to tell him about it. He offered Farber $300 and a job in his business if he would give him the information. Farber said he would think the matter over. Some days later, whilst he was still considering what he would do, and had not yet accepted Tannenbaum's offer, Tannenbaum came into Jacob Ratner's shop and asked Farber whether he had thought over the proposition. Farber said he would not give him any information because he did not know enough about the Writer machine. Tannenbaum then said that meanwhile he had found out how to make these beret hats and was already turning them out, and that he wanted Farber to come to see the berets he was then making.

The next day Farber went to Tannenbaum's place of business at 46 Great Jones street and Tannenbaum showed him one of the berets he had made, on the inside of which were the words "Hanky Beret." Farber told Tannenbaum that he did not have the right to use the words "Hanky Beret," and also that he could not use the Anderson & Writer machine, because they had a patent for it. Tannenbaum said that the Anderson & Writer Corporation could not do anything to him about that; that his hat was a lot better than the Anderson & Writer hat, and he wanted

Farber to go back to the plaintiff corporation and tell them that Tannenbaum was turning out a better hat than their hat.

The next question is how Tannenbaum suddenly secured the information for which he was seeking when he first approached Farber.

The reason why Tannenbaum first became interested in the plaintiff's machine was apparently because of the rapid increase in the production of berets shown by the plaintiff during March and April, 1929, by which time the berets produced by the plaintiff had risen in number to 22,356 a month.

Tannenbaum had become dissatisfied with his method of shrinking the material on collapsible wooden blocks or noncollapsible metal cones and was looking for a quicker method of making berets.

Some time about the middle of April he succeeded in getting the defendant Stafford to leave the plaintiff's employ and enter his employ.

The affidavits convince me that when Stafford left the plaintiff's employ he secretly took with him, as above stated, two upper dies of the plaintiff's machine. Two such dies were found missing immediately after his departure. Whether he took these with the connivance and at the suggestion of Tannenbaum, or whether he took them to increase his value with his new employer I do not know; but I think it undoubtedly is the fact that he took the dies and, with these upper dies, which are an important part of the plaintiff's machine, Tannenbaum was able to get started in making the copy of the plaintiff's machine which he subsequently did.

It is extremely significant that about April 24th Tannenbaum purchased from the firm of Valente & Micheletti, manufacturers of hat blocks and dies, of 512 Greene street, New York City, two special aluminum castings which were typical of the lower dies of the Writer patent. They were duly billed to the Petite Hat Company which paid in part at least for them. This Tannenbaum admits.

About the same time he purchased from a diemaker, Martin-Giusti Company, who made the dies for the Anderson & Writer Corporation, a top die typical of the die used in the plaintiff's machine.

Tannenbaum paid cash, but did not give a written order for this die, and so no written record of the transaction was kept.

Mr. Martin, of the Martin-Giusti Company, tells in his affidavit of a second call from Tannenbaum which he describes as follows: "Some three or four days later, though on a date I am not able exactly to fix, Tannenbaum came in again to the place of business of Martin-Giusti Company and asked to see the pattern from which Martin-Giusti Company was then making (or had made) top dies for Anderson & Writer Corporation. He said he had made a mistake in the measurements of the die he had already purchased from Martin-Giusti Company and wanted to get the correct measurements from the die of Anderson & Writer Corporation. At this stage I asked him who he was and he told me his name was Morris Tannenbaum of Yankee Beret, Inc., 1440 Broadway, New York City. I told him I was sorry that I could not give him the measurements of the Anderson & Writer Corporation's pattern as I had returned the same to Mr. Henry Anderson."

Tannenbaum admits that before the end of the month of April he had at least six tam-pressing machines set up and at work in his shop. These machines were almost exact copies of the plaintiff's machines.

On April 25th Tannenbaum organized a new company bearing the name of the Hanky Beret, Inc. This company is one of the defendants in this case.

I find that this was done for the purpose of taking and using the trade-name which the plaintiff had put on its berets, and which had not yet been registered in the United States Patent Office as a trade-mark.

By this time it must be remembered that the plaintiff's production of berets with the Hanky Beret label had risen to more than 20,000 per month.

Tannenbaum, whose affidavit is honeycombed with perjury, has denied all knowledge of the plaintiff's machine, and the plaintiff's rights at the time he built and put in operation a machine precisely like the plaintiff's. The only appropriate comment on such a statement under the circumstances here shown is that the deponent has not any regard for his oath, or any intention of dealing candidly with the court.

Tannenbaum's attitude in taking the plaintiff's trade-name of "Hanky Beret," and then, when threatened with suit, in changing the name, from "Hanky Beret," to "Yankee Beret," is, as the plaintiff's attorneys justly say, an admission of an offense and threat to continue the offense in the future. For this change was not any real change in sound, and still constitutes most unfair competition.

Tannenbaum's business thus illegally founded has grown apace. He now has 72 infringing machines at work, and, as above pointed out, he has been at some pains in en-

deavoring to make minor changes in the machine so that he may, if possible, escape from the claims of the plaintiff's patent.

I have found, however, that these changes are all of a minor nature, and that the machine which the defendant is now using is in all essentials the plaintiff's machine and an infringement of the plaintiff's patent. Cf. Sanitary Refrigerator et al. v. Alexander F. Winters et al., 280 U. S. 30, 50 S. Ct. 9, 74 L. Ed. —— decided by the Supreme Court October 14, 1929.

 Having marketed their product in a dress and by methods which constitute most unfair competition, and having mixed their infringement with dishonesty and endeavored to excuse it by false affidavits, the defendants are not in a position to complain of the somewhat drastic remedy I am granting to the plaintiff. Milwaukee Printing Co. v. Stover et al. (C. C. A.) 290 F. 387, 388.

Counsel may attend before me to consider the amount of the bond to be filed by the plaintiff.