## GILLETTE SAFETY RAZOR CO. v. STANDARD SAFETY RAZOR CORPORATION.*

### No. 2207.

District Court, D. Connecticut.

Dec. 12, 1932.

See also (D. C.) 2 F. Supp. 64.

George P. Dike, of Boston, Mass., and Henry F. Parmelee, of New Haven, Conn., for plaintiff.

George E. Middleton, of New York City, and Bristol & White, of New Haven, Conn., for defendant.

THOMAS, District Judge.

This is a suit brought by the plaintiff to restrain an alleged infringement of letters patent No. 1,858,316, issued May 17, 1932, to the plaintiff as assignee of Ralph E. Thompson and Theodore L. Smith for improvements in safety razors, on an application filed July 30, 1930. Infringement of claims 1, 4, 5, 7, 8, 9, and 11 is charged. Of these claims 1, 4, and 5 are combination claims for a safety razor, while claims 7, 8, 9, and 11 are for a razor blade. The plaintiff charges defend-

*For opinion reversing decree, see 64 F.(2d) 9.

ant with contributory infringement of claims 1, 4, and 5 and with direct infringement of the remaining claims, to wit, 7, 8, 9, and 11.

The Thompson and Smith Patent in Suit.

This patent describes a safety razor which is an improvement on the so-called "Gillette Type" of razor. In this type of razor a thin, flexible, and elastic blade of oblong contour with unsharpened ends, and internally apertured to receive positioning and clamping means, is removably secured in a holder which is made up of three parts, namely, a guard member, a cap, and a handle. The guard member is adapted to support the blade adjacent to its longitudinal cutting edges. The cap is provided on opposite sides with parallel straight edges which engage the blade adjacent to the cutting edges of the latter and flex it transversely on the guard member (like a fulcrum) during the process of clamping the blade by means of the handle between the guard member and the cap, so that when the parts are assembled, the blade is maintained in transversely curved position and is externally supported adjacent its cutting edges to give it rigidity while shaving. A razor of this type is described in the original Gillette patent, No. 775,134, Defendant's Exhibit U. Its commercial form as manufactured by plaintiff is in evidence as Plaintiff's Exhibit 4. This razor was the original Gillette and is referred to in the record as the "old style" Gillette razor.

During the many years that plaintiff manufactured and distributed its razors, several more or less important improvements were made thereon by plaintiff. The improvement made immediately preceding that of Thompson and Smith which is described in the patent in suit is one made by one of the co-inventors, Ralph E. Thompson. This improvement is shown and described in patent No. 1,815,745 and was before this court in Gillette Safety Razor Company v. Hawley Hardware Company, 60 F.(2d) 1019, decided July 21, 1932, and more recently in Gillette Safety Razor Company v. Standard Safety Razor Corporation (Equity No. 2233) 2 F. Supp. 64, decided December 8, 1932, in which case the parties were the same as the parties to this suit.

The invention described in the Thompson patent, No. 1,815,745, includes a "Gillette type" blade having cut-out corners so that any injury to the corners of the cap will not spring the blade out of shape and so force the cutting edge out of proper shaving position or cause the corners of the blade to break

off, and a cap provided with reinforcing lugs on the underside of each corner which fill in the cut-out corners of the blade to protect the blade and prevent injury to the cap corners, and a guard member having recesses to receive the lugs on the cap corners so that the razor elements will not be prevented from clamping the blade along its cutting edges. The Thompson blade has the usual two positioning pin receiving holes and between them a central perforation to accommodate the clamping pin on the cap element of the razor.

In an effort to improve the positioning means of the "Gillette Type" razor among other features, Thompson and Smith invented the razor and blade described in the patent in suit. They discarded the positioning pins of the old style Gillette razor and substituted therefor the positioning rib or bar 29 on the underface of the cap. (Figs. 2 and 3), which bar is extended through a slot 23 in the blade into a central groove 33 in the guard member. Comparing this structure with the old style Gillette razor, it will be noted that the length of the bar 29 exceeds the distance between the outer points of the two positioning pins of the old style Gillette razor. From the record it is clear that if the old three-hole blade of the old style Gillette razor swings on the positioning pins due to the normal clearance in the blade holes, more variation in the exposure of the blade at its ends is produced than is produced by the same clearance in the bar-type razor of the Thompson and Smith patent. From the testimony it is also certain that if the possible error at the ends of the blade of the three-hole blade is 2.4 thousandths of an inch, the same clearance will produce an error of only 0.8 thousandths of an inch or only one-third as much as in the three-hole blade. Therefore the error is reduced by two thirds. The evidence convinces me that accurate positioning of the blade in the holder is essential to good shaving and that the variation in exposure at the ends of the cutting edges of the blade causes unsatisfactory shaving. By making the blade positioning means longer, Thompson and Smith improved the old style razor construction by materially reducing the differences in edge exposure. Thompson and Smith applied their positioning bar to the Thompson cap described in patent No. 1,815,-745 and made it of the same length as the cutting edges of the blade, having found this to be the most satisfactory dimension. They discarded the three holes of the Thompson blade described in the patent and substituted therefor a slot to receive the bar on the underside of the cap. This slot they made at

least as long as the cutting edges, and thereby obtained new and useful results to which reference will hereinafter be made.

The Thompson blade, with its corner recesses, was found to be effective for the purpose described in the Thompson patent, No. 1,815,745, but in another respect it had a disadvantage. The removal of a portion of the metal of the blade at each corner weakened the blade and changed the distribution of the stresses to which it is subjected when flexed in the razor, with the result that the maximum stress per unit was increased and the factor of safety, already small, was correspondingly reduced.

One of the objects of the Thompson and Smith invention as shown and described in their patent was to provide a safety razor blade of the Thompson type which will have recesses at its corner portions and thus have the advantages of the Thompson patent, but in which the factor of safety will not be less than in prior blades of the "Gillette type." The patentees in their specification say, page 1, line 91, to page 2, line 8: "A blade made in accordance with this invention is a thin, transversely-flexible blade characterized by having a recess at each of its corner portions and a central longitudinally-extending slot which is substantially as long as the longitudinal edge portions of the blade between the corresponding recesses, so that the blade may be said to consist of two equal and symmetrical halves connected only by end portions which are located beyond the longitudinal edge portions of the blade and its central slot. The result of this formation is that when the blade is flexed transversely the stresses developed are concentrated in and substantially restricted to the end portions of the blade, the areas between the slot and the longitudinal edge portions being largely free from stress."

Their invention therefore consists not only in combining their special blade positioning means with the corner lug containing cap of Thompson in combination with the blade above described, but also in the blade per se as the latter has advantages even when combined with the old style Gillette razor.

Other advantages of the Thompson and Smith invention were not realized by them at the time they made their invention in the early part of June, 1929, and not even at the time the specification of the patent was signed by them, which was some time prior to July 30, 1930, but were brought out at the trial of this case. These advantages are:

1. Less likelihood of the buckling of the blade;

2. Less danger of breakage; and

3. Less trouble and loss to the manufacturer from buckling of the blade—and these advantages will be discussed in their order.

1. Razor blades are made from thin, soft stock of steel which is only a few thousandths of an inch thick. In the manufacture of blades the steel is hardened and tempered. In the hardening process the soft material is brought to the required temperature and then suddenly chilled. Thereafter it is tempered in order to give the steel the right condition for a cutting edge, making the edge tough enough to prevent ordinary cracking or abrading in the sharpening process and at the same time hard enough to maintain the edge so as to give a considerable amount of service to the user. The process of hardening and tempering is called heat-treating. In hardening the steel when it is suddenly chilled certain parts of the material cool more quickly than others, as the result of which severe internal stresses are set up within the steel. These stresses are known as hardening or temperature stresses. It will be readily seen that in the chilling step one part of the blade cools faster than the others. The cooled part shrinks instantly and pulls against the parts which have not yet been cooled and this causes the blade to buckle or warp. This trouble was long ago recognized by the plaintiff, and for a long while attempts have been made to cure it, as will be seen by reference to Plaintiff's Exhibits 9 and 10, which are the patent to Nickerson, No. 812,442, issued in 1906, as well as the patent to Petersen, No. 1,431,680, issued in 1922. Buckling, however, was not eliminated in the manufacture of plaintiff's blades until the advent of the invention disclosed by the patent in suit. Prior to and some time after Thompson and Smith made their invention, the plaintiff practiced the so-called "pack method" in the manufacture of its blades. By this method the blades were separately treated. They were blanked out from sheet stock and all operations thereafter were individual operations, although in the hardening step and some others a number of the separate blanks were stacked in frames—hence the description or name "pack method." While in the manufacture by the pack method of the old type three-hole Gillette blades considerable trouble was encountered in the hardening step due to buckling of the blades, this trouble was almost entirely avoided when the Thompson and Smith blade was adopted and its manufacture commenced. Later on,

but only in the manufacture of the Thompson and Smith blades, plaintiff started the so-called "strip" method in the manufacture of its blades. In this method the blades are produced from a long strip and are hardened and processed in the strip. It was found that the "strip" method was superior to the old "pack" process, and so, from the evidence in this record, I conclude that buckling troubles were eliminated by the use of the Thompson and Smith invention. Plaintiff's Exhibit 11 proves that buckling troubles were considerably eliminated by the plaintiff in its old "pack" method by changing over from the old style three-hole blade to the Thompson and Smith long-slot blade. This conclusion is supported by the testimony of Mr. Smith, one of the inventors of the patent in suit, who refers to plaintiff's 1929 accounting department records which show that during that year about 551,000,000 blanks were punched out and prepared for hardening. About 8 per cent. of these blanks, or a little over 45,-000,000 were rejected and junked on account of the injuries to the blades due to the buckled condition which developed in the hardening process, and that an additional 5½ per cent., or 35,000,000, were re-worked. A buckled condition was the principal defect of these 80,000,000 blades and such generally was the situation which prevailed in plaintiff's factory during the years previous.

The lesser tendency of the Thompson and Smith blade to buckle is one of the important advantages of the Thompson and Smith invention. Naturally a buckled blade results in a distorted edge. Good shaving with a Gillette razor depends upon a straight cutting edge clamped with uniform pressure throughout its length. The buckled blade will not permit the blade to lie in proper alignment and give even edge exposure in the razor no matter how great the pressure which is applied to the blade in clamping together the elements of the razor. The importance of maintaining a uniform edge exposure and without variation throughout the entire length of the blade was explained by Mr. Smith, and I am satisfied that he is right about it. It is important to the user of the blade that he gets results which are satisfactory. If the edge exposure varies along the length of the blade, the results are bound to be unsatisfactory; but where the cutting edge of the blade is evenly exposed and does not vary throughout the entire length of the blade, the shaving results to the user will be satisfactory.

From the foregoing discussion it is evident that the Thompson and Smith invention contributes to the good shaving qualities of the Gillette type of razor for two reasons: First, because the blade is accurately positioned in the razor; and, second, because the long slot blades are almost devoid of buckling and so possess and present a superior cutting edge to the face of the user.

2. For some reasons which are not yet fully understood by plaintiff or the inventors Thompson and Smith, their blade is less subject to that type of breakage which has been termed in the testimony as "corrosion breakage." Tests were conducted on behalf of plaintiff to ascertain whether the Thompson and Smith blades or the old type, the three-hole Gillette blades, are more subject to breakage when clamped in a razor. These tests were made by clamping both types of blades in identical safety razors and subjecting them to damp air under identical conditions and reversing them at frequent intervals, on the theory that if there was a systematic breakage of one type of blade or the other that it would appear more rapidly when accompanied with the weakening of the blade which is due to corrosion than if it was undertaken to make long time tests with a corrosive agent. In other words, the tests were accelerated, but deductions may be made therefrom as to the breakage of blades in ordinary use. It appears that there is a decidedly greater tendency for the three-hole blades to break than there is for the long-slot blades.

3. The decided absence of buckling of the Thompson and Smith blades is not only advantageous to the user but results in a decided benefit to the manufacturer. As already noted, the plaintiff had to scrap an appreciable amount of its blanks and to re-work others. The loss to plaintiff in 1929 from blades scrapped because of buckling troubles was about $267,863 and that the cost of re-working buckled blades which were salvaged amounted to about $38,923, making a total loss of something over $306,000. Corresponding losses were experienced by plaintiff from 1925 to 1927. Buckling was thus a serious matter for plaintiff and it continued up to the time that Thompson and Smith invented the long-slot blade.

In addition to the monetary loss due to buckling, it was found that buckling was likely to cause unsatisfactory and troublesome cutting edges in the sharpening operation in the factory and serious trouble with the automatic machinery used in the single unit manufacturing method.

Claims 5 and 7 are typical of the claims in suit. They read:

"5. A safety razor comprising a transversely-flexible blade provided at each of its corner portions with a recess and having a central longitudinal slot of substantially the same length as its cutting-edge portions, a blade-clamping cap provided with a central longitudinal rib adapted to enter the slot in the blade to position the latter, a guard member having a recess to receive said rib, and means for clamping the parts together."

"7. A safety razor blade adapted to be flexed transversely by the clamping action of a holder and comprising two cutting-edge portions separated longitudinally by a slot and connected at their ends by flexing hinges which are located beyond the cutting-edge portions, the latter being bounded at their ends by transversely-extending recesses which limit the cutting-edges to a length not exceeding that of the slot."

Claim 5 specifies a central longitudinal rib on the cap for co-operation with a recess in the guard member and with a blade slot of substantially the same length as its cutting-edge portions. Claim 7 defines a blade as called for in claim 5, but includes the transversely-extending recesses in the ends of the blade for limiting the cutting edges to a length not exceeding that of the slot. In claim 7 flexing hinges are referred to which connect the blade sections, said hinges being disposed beyond the cutting-edge portions, which means that the slot is at least as long as the cutting edges.

The defenses relied upon are:

A. Invalidity of the claims in view of the prior art.

B. Noninfringement as a matter of law so far as the razor claims are concerned.

### Invalidity.

Defendant relies on the following prior art patents: (1) Nordskog, No. 1,342,028; (2) British patent to Blau, No. 170,806; (3) British patent to Taylor, No. 178,188; (4) Hesselbo Danish patent, No. 21,997; (5) United States patent to Clark, No. 933,020; (6) Clark, No. 967,500; (7) Clark, No. 972,436; (8) Moderegger British patent, No. 216,742; (9) Ballreich, No. 1,246,219; (10) Smith, No. 1,581,694; (11) Thompson, No. 1,815,745; and (12) Molkenthin, No. 1,869,327.

Although defendant combines several of these patents to meet the claims of the patent in suit, I shall first consider them separately in order to ascertain what they disclose.

Nordskog, No. 1,342,028, discloses an elliptical blade having a cutting edge around its entire periphery and a longitudinally "elongated" slot terminating at its ends in round holes with a round hole in the central portion of the blade. The blade is bent between the guard and cap members into such shape that its "cutting edge rests substantially in the surface of a sphere," and it is for this reason that the slot and the holes at ends of the slot are provided therein. Compared with the invention of the patent in suit it is obvious that the Nordskog blade has a slot which is shorter than its cutting edges; that it has no cut-out corners and so has no flexing hinges beyond the ends of the cutting edges in which the stresses are localized.

Blau, British patent, No. 170,806, shows and describes a "Gillette Type" blade, which differs from the old type Gillette only in that the three holes therein are connected by a slot. This slot was never intended for positioning purposes and its length is less than that of the cutting edge. It has no cut-out corners, and consequently it has no hinges formed beyond the cutting edges in which the stresses are caused to be localized.

Taylor British patent, No. 178,188, shows a plurality of relatively thick blades which are made readily pliable by removing some of their substance at the parts which are to be bent (page 2, lines 1 to 4, inclusive). Defendant evidently relies on Figs. 1 and 4 of this patent, which show the slots, but they are shorter than the cutting edges and do not extend beyond the usual three holes in the old Gillette blade. Nor does the Taylor blade have any cut-out corners.

Hesselbo Danish patent, No. 21,997, illustrates a blade having three holes and two slots extending at the center line thereof from the ends of the blade toward the center hole. There are two hinges in this blade located in its central portion, and it results that any stresses which are formed by bending the blade are concentrated in the center of the blade and transmitted to the cutting edges, thereby distorting the same rather than maintaining them in a straight position. This blade has no cut-out corners and no hinges which are located beyond the cutting edges. The specification mentions several modifications of the structure illustrated, but no matter how it is interpreted, it does not teach the relationship of slot, cutting edges, and corner recesses of the Thompson and Smith blade.

Clark patents, Nos. 933,020; 967,500; and 972,436, all disclose slotted blades, but in each construction the slot is shorter than the length of the cutting edge. In fact, the length in each case corresponds exactly with

the distance between the three holes of the old type Gillette blade. The blades have no cut-out corners. The first Clark patent shows a razor having on its guard projections 15 to extend through the blade slot into recesses 21 in the cap. The distance between the ends of the projections 15 corresponds to the length of the slot in the blade.

Moderegger British patent, No. 216,742, shows a blade having the usual three holes. It lacks the cut-out corners. In flexing this blade it has four hinges; that is to say, the material between the blade ends and two outer holes and the material between the two outer holes and the central hole.

Ballreich, No. 1,246,219, discloses a blade of the old Gillette three-hole type having positioning notches at its corners. It has four flexing hinges like the Moderegger patent.

Smith, No. 1,581,694, shows a razor having a blade which is in the form of an oblique parallelogram. Several blade forms are illustrated. Fig. 13 discloses a slotted blade, but the length of its slot is shorter than that of the cutting edges and the blade has no cut-out corners. The razor construction in the modification shown in Figs. 15 and 16 includes a pair of ribs 67 and 68 on the underside of the cap which are adapted to enter the blade slot and a groove in the guard member. The distance between the outer ends of the ribs 67 and 68 correspond to that of the length of the slot.

Thompson, No. 1,815,745, discloses a three-hole blade with cut-out corners. The blade has four hinge portions as any other three-hole blade. Moreover, the recesses at the corners of the blade do not have the function of forming hinges at the ends of the blades which are located beyond the cutting edges.

Molkenthin, No. 1,869,327, will be discussed later on in this opinion.

Each of the combination claims of the patent in suit include a blade, and the blade claims each specify a blade, the characteristic feature of which is a slot the length of which corresponds to that of the cutting edge of the blade in combination with recesses in the blade corners, one function of which is to limit the length of the cutting edges so that they do not exceed that of the blade slot. The claims vary in phraseology by referring to hinges which are located beyond the cutting edges, etc.; but their legal effect is the same. No matter how the prior art patents relied upon by defendant are combined, I am unable to conceive how such combination meets any one of the claims in suit either in letter or spirit. No matter how these patents are combined, some additional element must be added to the combination in order to obtain the structures defined by the claims. However, such additional element is furnished by the defendant as a result of an ex post facto judgment—of his having first obtained knowledge of the invention of the patent in suit. The additional element which made the invention in suit an improvement over the prior art and imparted utility to it is not to be found in the prior art.

The Thompson and Smith blade has the advantages herein before described because its slot is at least as long as its cutting edges and is provided with cut-out corners which operate to limit the length of the cutting edges in relation to the slot. The razor, as such, has its advantages because the positioning means on one of its elements extends beyond the usual three studs of the old type Gillette razor. Nowhere do I find any suggestion in the prior art relied upon which suggests, even remotely, the combinations defined by the razor claims or by the blade claims. For instance, the defendant argues that the Nordskog, Blau, Taylor, and Hesselbo patents all disclose safety razor blades slotted longitudinally to increase flexibility, and that Taylor discloses all manner of slots, holes, and slits punched into a safety razor blade. This is true, but where is there a suggestion in any one of these patents which co-relates the length of the slot with that of the cutting edge and with cut-out corners which limit the length of the cutting edges of the blade? The same applies to the three Clark patents. Defendant further contends that if the patent to Moderegger was provided with a slot between its holes, as suggested by Nordskog and Blau, the resulting slot would be even longer than the cutting edges. Aside from the fact that this argument is fallacious because the mere drawing of a line across the outer hole of a Moderegger blade to the ends of the cutting edges clearly reveals the fact that the slot would be just as long as the cutting edges, it does not appear that the blade would have cut-out corners, and granting that the Ballreich patent suggests cut-out corners, there is no direction given by reading the Moderegger, Ballreich, and either the Nordskog or Blau patents which would teach how the cut-out corners are to be located in the modified Moderegger blade unless recourse is had to the Thompson and Smith specification.

Defendant seems to rely upon a certain theory to the effect that inasmuch as the Ball-

reich patent has corner recesses and "two short slots, the outer ends of which are substantially on a line with the ends of the cutting edges," and inasmuch as these slots may be elongated so that only a little metal is left adjacent the central hole, and if this metal is removed we have the Thompson and Smith blade. According to defendant's argument if we remove the metal which is left, as taught by Nordskog, Blau, or Clark, there is no invention. If this reasoning is sound, then the most meritorious inventions will fall because along similar lines it could be argued that even the most complicated mechanism consists only of the elementary mechanical elements known to science.

But the defendant goes further and avers that any one of the Clark blades could be provided with cut-out corners as taught by the Thompson patent, No. 1,815,745, and then we would have the Thompson and Smith blade, corner recesses and slot as long as the cutting edges, flexing hinges, and all. The fallacy of this is evident when we consider that the Thompson blade described in his patent No. 1,815,745 has cut-out corners which are located beyond the two outer holes thereof. If this feature should be applied to any one of the Clark blades, the Clark slot would be considerably shorter than the cutting edges. As a matter of fact, the same relationship between the slot and the cutting edge would prevail as in the structure disclosed in the three Clark patents.

To sum up it will be noted that in order to obtain by a combination of the prior patents the Thompson and Smith blade, it is necessary to extend the slot of any one of the structures described in those patents so as to make it coextensive with a cutting edge, and to provide recesses in the blade corners in the relation and for the purpose above set forth. As this is not taught by the references, taken either singly or in combination, their combination is unjustified. The mere discovery of the elements in separate patents in the prior art without the knowledge of their relationship—which is the essence of the invention, is not sufficient.

The invention described in the Thompson and Smith patent should not be held to be anticipated by one or more prior patents which do not contain even a hint from which it can be inferred that the patentees had recognized the difficulties which the inventor of the device described in the patents in suit sought to and did remedy. In Kulp v. Bridgeport Hardware Mfg. Corporation (D. C.) 19 F.(2d) 659, it was held that to nega-

tive invention in a novel invention it is necessary to find in the prior art not merely the construction which may be modified to make the patented device, but a suggestion not only that the modification should be made, but how to make it as well. In Naylor v. Alsop Process Co., 168 F. 911, Judge Amidon speaking for the Circuit Court of Appeals in connection with the rule here applicable said on page 920: "When it is sought to ascertain the state of the art by means of prior patents, nothing can be used except what is disclosed on the face of those patents. Such patents cannot be reconstructed in the light of the invention in suit, and then used as a part of the prior art."

As I view it that is exactly what the defendant attempts to do in the case at bar. In Line Material Co. v. Brady Electric & Mfg. Co., 299 F. 822, this court on page 824 said: "With respect to patents which might, by some manipulation or alteration, accomplish a given purpose not unlike the purpose disclosed in the patent in suit, after the obvious simplicity of the patent itself becomes apparent, the law is settled that such device or patent does not constitute anticipation."

The rule here applicable has been so well stated by Mr. Justice Day, speaking for the Supreme Court in Expanded Metal Co. v. Bradford, 214 U. S. 366, 29 S. Ct. 652, 53 L. Ed. 1034, that the question can no longer be open to doubt. On page 381 of 214 U. S., 29 S. Ct. 652, 655 he said: "It is often difficult to determine whether a given improvement is a mere mechanical advance, or the result of the exercise of the creative faculty amounting to a meritorious invention. The fact that the invention seems simple after it is made does not determine the question; if this were the rule, many of the most beneficial patents would be stricken down. It may be safely said that if those skilled in the mechanical arts are working in a given field, and have failed, after repeated efforts, to discover a certain new and useful improvement, that he who first makes the discovery has done more than make the obvious improvement which would suggest itself to a mechanic skilled in the art, and is entitled to protection as an inventor. There is nothing in the prior art that suggests the combined operation of the Golding patent in suit. It is perfectly well settled that a new combination of elements, old in themselves, but which produce a new and useful result, entitles the inventor to the protection of a patent. Webster Loom Co. v. Higgins, 105 U. S. 580–591, 26 L. Ed. 1177–1181." See, also, H. D. Smith

**60**

& Co. v. Peck, Stow & Wilcox (C. C. A.) 262 F. 415 at page 417.

In view of the rules and decisions applicable, I must hold that the prior art patents in evidence cannot and do not invalidate the patent to Thompson and Smith.

I am not unmindful of defendant's argument with reference to plaintiff's stress theory and its buckling theory, nor have I left out of consideration defendant's argument directed to the fact that certain of the advantages claimed by plaintiff are not described in the patent in suit and that the specification states a theory different from that brought forward at the trial.

The defendant offered the testimony of Professor Furman as an expert witness. He testified that he had been called into the case about ten days before trial; that he had made no experiments to determine the correctness of his statements; that he had not been able to figure mathematically the stresses and strains in the blade, although he had made an attempt to do so but could not find any evidence that was dependable; and that he testified only from his general knowledge as to what takes place when a plate is pressed between two other plates; and that the subject-matter, in his opinion, is a general sort of problem. It appears from his testimony that he had considered only the bending stresses in the three-hole and long-slot blades and was not prepared to discuss the heat treatment stresses. From the testimony adduced by the plaintiff, however, I am satisfied that these two types of stresses are superimposed on the blade when it is clamped between the razor elements and that plaintiff's stress theory advanced at the trial is correct. No substantial evidence has been offered by defendant to rebut plaintiff's testimony regarding buckling or plaintiff's theory with reference to it.

Defendant argues that Plaintiff's Exhibit 11, the various blade stacks, prove only that the strip method is superior to plaintiff's early pack method. Plaintiff argues that this exhibit clearly proves the superiority of the long-slot blade over the old type three-hole blade. My examination of the exhibit convinces me that plaintiff's argument is sound bearing in mind that the three-hole blades made by the strip method (stacks 5 and 6 which were bought in the open market) are distinctly more springy and therefore more warped than the corresponding stacks 7 and 8 of slotted blades which are defendant's Norwalk blades. The springiness of the stack is merely the accumulated result of the warping of the individual blades comprising the stack. It therefore affords a very good comparison and the Exhibit shows conclusively that the long-slot blades warp less than the three-hole blades regardless of the process by which they are made.

The fact that at trial the plaintiff relied upon certain advantages of its blades which are not described in the patent in suit, and that the theory of the patent is in some respects not identical with the theories expounded at trial, presents no unusual situation. I know of no decision which prevents a plaintiff from relying at the trial on advantages not described in the patent. It is well settled in law that the fact that the inventor did not foresee all the benefits which might subsequently accrue from his invention or understand completely its theory of operation or appreciate its whole field of usefulness does not detract from the merit of the invention as long as the patent itself contains a clear description of its construction. We find the rule succinctly stated in Corpus Juris, vol. 48, § 71, p. 67, in the following language: "But the mere failure of the inventor to appreciate all the benefits and possibilities of his invention does not deprive him of protection therefor. The inventor is entitled to the benefit of the uses to which his invention can be applied, and every way in which it can be utilized to perform its function, whether or not he was aware of all of these uses or methods of use or not. If there be in the concept an actual advantage and the structure embodying the concept discloses invention, a patent will not fail merely because the principal advantages of the invention prove to be different from the one chiefly in the inventor's mind."

Judge Buffington, speaking for the Circuit Court of Appeals, Third Circuit, in Westmoreland Specialty Co. v. Hogan, 167 F. 327, 328, expressed the rule as follows: "It is true that at the time this patent was applied for the particular process of moisture supply from a metal cap and the insulating capacity of celluloid to stop it were not stated, or, indeed, known to the patentee. He knew metal caps would oxidize, and substituted celluloid to stop oxidation, and such use has shown that the stoppage of oxidation resulted in keeping the salt dry. But the mere failure of a patentee to realize all the benefits and possibilities of his invention is not fatal. The after-discovery of unsuspected usefulness in a disclosed apparatus, far from detracting from its value, may serve to enhance it. It

is the benefits which test, use, and time unfold that really determine merit."

In Marconi Wireless Telegraph Co. of America v. De Forest Radio Telephone & Telegraph Co. (C. C. A.) 243 F. 560, Judge Hough said on page 563: "Whether Mr. Fleming's theories of rectification were right or not has nothing to do with the question of invention or validity. The patentee may not understand his own mechanism; but if he shows and describes it, and it produces a new result, the law is satisfied. Van Epps v. United, etc., Co., 143 F. at page 872, 75 C. C. A. 77."

And in the Van Epps Case, just cited, Judge Townsend expressed the rule quite broadly. On page 872 of 143 F. he said: "The language of the patent fails to state any theory of the patentee as to the presence of air below the screen-plates. But where a patent discloses means by which a novel and successful result is secured, it is immaterial whether the patentee understands or correctly states the theory or philosophical principles of the mechanism which produces the new result."

And finally Mr. Justice McKenna, speaking for the Supreme Court of the United States in Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U. S. 428, 31 S. Ct. 444, 55 L. Ed. 527, not only cited with approval the cases cited supra, but on page 435 and 436 of 220 U. S., 31 S. Ct. 444, 447, restated the principle under discussion in no uncertain way. He said: "A patentee may be baldly empirical, seeing nothing beyond his experiments and the result; yet if he has added a new and valuable article to the world's utilities, he is entitled to the rank and protection of an inventor. And how can it take from his merit that he may not know all of the forces which he has brought into operation? It is certainly not necessary that he understand or be able to state the scientific principles underlying his invention, and it is immaterial whether he can stand a successful examination as to the speculative ideas involved. Andrews v. Cross [C. C.] 19 Blatchf. 294, 8 F. 269; Eames v. Andrews, 122 U. S. 40, 55, 7 S. Ct. 1073, 30 L. Ed. 1064, 1069; St. Louis Stamping Co. v. Quinby, 4 Ban. & Ard. 192, 16 Off. Gaz. 135, Fed. Cas. No. 12,-240; Dixon-Woods Co. v. Pfeifer, 5 C. C. A. 148, 14 U. S. App. 245, 55 F. 390; Cleveland Foundry Co. v. Detroit Vapor Stove Co. (C. C. A. 6th C.) 68 C. C. A. 233, 131 F. 853; Van Epps v. United Box Co. (C. C. A. 2d C.) 75 C. C. A. 77, 143 F. 869; Westmoreland Specialty Co. v. Hogan (C. C. A. 3d C.)

93 C. C. A. 31, 167 F. 327. He must, indeed, make such disclosure and description of his invention that it may be put into practice. In this he must be clear. He must not put forth a puzzle for invention or experiment to solve, but the description is sufficient if those skilled in the art can understand it. This satisfies the law, which only requires as a condition of its protection that the world be given something new and that the world be taught how to use it. It is no concern of the world whether the principle upon which the new construction acts be obvious or obscure, so that it inheres in the new construction."

Certain arguments were advanced by defendant in this case which were relied upon in case No. 2233 between the same parties, and so this opinion at the expense of repetition must contain the same discussion found in No. 2233.

Defendant has reviewed at considerable length the history of the early Gillette patents long since expired, and charges that plaintiff is now seeking to revive the monopoly it enjoyed under its early patents. The answer to such an assertion is that the plaintiff's monopoly under its early and expired patents could only be revived in the event that our patent laws permitted the extension of the life of a patent. It is not contended by defendant that plaintiff has made application for the extension of the term of its earlier patents. Nor am I persuaded by defendant's argument that plaintiff, having enjoyed its monopoly for so many years, should now be content to sit idly by and watch competitors, who have made no invention but simply copied plaintiff's article, take away the business rightfully belonging to the plaintiff which by earnest endeavor has been built up over a period of many years and which it seeks to improve with advancing patents which in a certain sense inure to the benefit of the public. There is nothing in our patent law which prevents any one from making improvements on an existing structure and obtaining a patent therefor if he otherwise complies with the law in such case made and provided. It appears from the record that the patent in suit was obtained after due proceedings first had in the Patent Office; and I concur with the examiner that the invention described by Thompson and Smith was and is new and useful and that the claims relied upon are not anticipated by the prior art.

Defendant further asserts that the invention shown in the Thompson and Smith patent was made to prevent others from fitting the Gillette razors with blades of their

own make. Assuming it to be true such a contention cannot be seriously considered by a court of equity. What defendant is really complaining about is the fact that Thompson and Smith invented a razor construction which was found to be patentable and so precludes the defendant from cutting into the plaintiff's business. Indeed, this may be quite detrimental to the defendant's business but it in no way contravenes the patent laws of the United States.

The defendant practically admits in the affidavits filed on the preliminary injunction proceedings that because it did not make razors of its own it was forced to adopt its Rio and Norwalk blades in order to be in a position to compete with the plaintiff for the blade business and that it has adopted its blade construction on advice of counsel. I find that there is no evidence in this case of any originality on the part of the defendant in the razor field or in the structure of its blade. From defendant's admissions it is perfectly apparent that it bodily adopted the Thompson and Smith invention because it needed the same and because it had to have its Rio and Norwalk blades with the Thompson and Smith invention embodied therein. So, in order to justify this conduct, defendant charges plaintiff with an extension of a monopoly as though it were an illegal act and disputes the novelty and the value of the Thompson and Smith invention and relies upon a number of prior patents. It must be noted that the razor art is a crowded one, and though it is obvious that all of the prior art is open to the defendant, yet it uses the Thompson and Smith invention. On the one hand, it gives the tribute of its praise to the prior art, but on the other hand it gives the Thompson and Smith patent the tribute of its imitation. The principle of law found in Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U. S. 428, 31 S. Ct. 444, 55 L. Ed. 527 is particularly apposite to defendant's claims and conduct. See, also, Fones v. American Specialty Co. (D. C.) 38 F.(2d) 639, 642; General Electric Co. v. Wagner Electric Manufacturing Co. (C. C. A.) 130 F. 772, 778; Anderson & Writer Corporation v. Hanky Beret, Inc. (D. C.) 36 F.(2d) 412, 414; Skelton v. Igoe Bros. (D. C.) 29 F.(2d) 837, 840.

Inasmuch as the defendant's Rio and Norwalk blades are imitations of the Thompson and Smith blade, the above-cited cases are controlling, and the more so because according to the testimony of Professor Furman, defendant's expert, the old style three-hole Gillette blade is more favorable to stresses in comparison with the blade described and claimed in the patent in suit, so much so that he would recommend the three-hole blade in preference to the slotted blade.

I shall now take up for consideration the patent to Molkenthin, No. 1,869,327, on which the defendant relies. The application for this patent was filed October 14, 1930, which is a considerable time after the Thompson and Smith invention became known to the general public. See Plaintiff's Exhibit 18, Saturday Evening Post dated March 8, 1930. Consequently the disclosure of the Molkenthin patent is too late to operate as a bar to the Thompson and Smith claims. The Molkenthin patent illustrates and describes a blade on which the blade claims relied on by plaintiff are readable, as the blade illustrated and described has a slot as long as the cutting edges as well as cut-out corners, but neither illustrates nor describes a combination of a blade and razor on which the razor claims relied on by plaintiff are readable. The Molkenthin patent contains a single claim which is broader than the blade claims of the patent in suit and makes no reference whatever to the cut-out corners of the Thompson and Smith blade. In other words, this claim calls for a blade having a slot which is at least as long as the cutting edges, but it stops right then and there. The application which resulted in the Molkenthin patent was in interference with application of Thompson and Smith which resulted in the patent in suit. In answer to a question propounded by the defendant in this suit the plaintiff stated: "Plaintiff will claim February, 1926, as the date of the invention defined in the claim of the patent to Joseph Molkenthin, Jr., dated July 26, 1932 No. 1,869,327."

The defendant attempts to construe this answer as proof that Molkenthin is the first inventor of the invention defined by the claims of the patent in suit, evidently making no distinction between the phrases "invention defined in the claim of the patent to Joseph Molkenthin" and the "invention illustrated and described in the patent to Joseph Molkenthin." The two patents cover different inventions, as will hereafter appear. The Molkenthin patent has a generic claim, while the Thompson and Smith patent has specific claims. The interference proceedings above referred to are not in evidence, but the fact that the Patent Office granted both the Molkenthin and Thompson and Smith patents is prima facie evidence of the fact that the claims of the Thompson and Smith patents in suit are patentable over the invention

claimed by the Molkenthin patent. No attempt was made by defendant to overcome this prima facie evidence save in the cross-examination of Professor Norton, the plaintiff's expert. Defendant there attempted to prove that if the Thompson and Smith blade was lacking the cut-out corners—that is, if it were the blade defined by the Molkenthin claim—it would have the same stress distribution and buckling-preventing characteristics which plaintiff attributes to the Thompson and Smith blade. In other words, the defendant contends that the blade defined in the claims in suit is not patentable over the blade defined by the Molkenthin patent.

As I view it there is no merit in this contention, because the Thompson and Smith blade has corner recesses which perform a double function: First, they co-operate with corner lugs of the cap; second, they co-operate with the cutting edges of the blade to limit their length in relation to that of the slot. The Molkenthin blade, as defined by the single claim of the Molkenthin patent, has no cut-out corners, so that no co-operation of such element with lugs on the cap and the slot in the blade can be obtained in the Molkenthin structure. Furthermore, the slot in the blade of Thompson and Smith is a positioning slot and a means with which to localize the bending strains in the hinges at the ends of the blade and a means for preventing or minimizing buckling of the blade. In the Molkenthin blade as defined by the claim, the blade slot is not a positioning means. The blade has three holes to receive the three pins of the holder as in the old style Gillette razor, and the slot proper performs no function in positioning the blade. I conclude therefore that the combination of the functions, the peculiar arrangement by which the slot serves as the positioning means, the cut-out corners co-operating with the lugs on the underside of the cap, while both the slot and cut-out corners co-operate with each other to form flexing hinges, were the result of marked ingenuity on the part of Thompson and Smith and without doubt constitute patentable invention over anything claimed in the Molkenthin patent. The peculiar relationship of the long slot, the corner recesses, and the cutting edges limited to a length no greater than that of the slot of the Thompson and Smith patent in suit is the result of an inventive act and each element in the combination is as essential as any other. The corner recesses cannot be omitted any more than the cutting edges or the slot. I am concurring with the decisions of the Patent Office tribunals and am aided in reaching the conclusion as to the

patentability of the Thompson and Smith claim by the evidence adduced. It appears that if the Molkenthin blade is flexed in a razor, a different stress distribution will be had therein than in the Thompson and Smith blade. A greater stress will be transmitted to the ends of the sharpened edge surfaces (the cutting edges), which will produce a difference in direction, a difference in amount, and a difference in effect.

### B. Infringement.

We now come to the question of infringement. The record shows that the defendant has stipulated that it has made and sold within the District of Connecticut, and without license from plaintiff, safety razor blades like Plaintiff's Exhibit No. 6, defendant's Rio blade, and that the blade marked Plaintiff's Exhibit No. 7, defendant's Norwalk blade, subsequent to the issuance of the patent in suit and prior to the filing of the bill of complaint herein, together with Plaintiff's Exhibit No. 6 (Rio blade), were made to fit, and were sold with the intent that they should fit, and be used with Gillette razors of the bar type like Plaintiff's Exhibit No. 2 (New Gillette Bar type razor, and the prior Gillette razors), and that such sales by defendant were for replacement purposes only. The stipulation further shows that defendant neither makes nor sells razors.

Both Plaintiff's Exhibit No. 6 (defendant's Rio blade) and Plaintiff's Exhibit No. 7 (defendant's Norwalk blade) have all the elements of the blade claims of the patent in suit. This is practically admitted by defendant, so that I am constrained to hold that defendant's blades infringe claims 7, 8, 9, and 11 of the patent in suit. As to the combination claims which are claims 1, 4, and 5, the plaintiff charges contributory infringement. Defendant asserts that the sale of its razor blades for use in plaintiff's razors does not, as a matter of law, constitute contributory infringement in view of the decision of the Supreme Court of the United States in Wilson v. Simpson et al., 9 How. 109, 13 L. Ed. 66, and the subsequent decisions of the lower courts down to and including the recent case of American Safety Razor Corp. v. Frings Bros. Co. (D. C.) 56 F.(2d) 449, even if the claims which are charged to be contributorily infringed are valid.

Defendant argues that the decision on contributory infringement in Gillette Safety Razor Co. v. Hawley Hardware Co. (D. C.) 60 F.(2d) 1019 is not controlling here because it is before this court on a new record

and has presented new testimony and new arguments not presented in the Hawley Case. Except for defendant's additional arguments I am of the opinion that the record here is for all practical purposes quite the same as the record in the Hawley Case. There is nothing here which persuades me to change the conclusions reached in the Hawley Case as to contributory infringement. If anything, it seems to me that the evidence adduced on this point by the plaintiff is more convincing even than the evidence in the Hawley Case. I refer particularly to the testimony of the witnesses Frissell and Becher, both of whom are connected with manufacturers of razor blade stropping devices. Defendant has introduced testimony of a single witness in a futile attempt to rebut the testimony of plaintiff's witnesses and relies on arguments only with reference to the law laid down in Wilson v. Simpson, supra. These arguments are not persuasive and do not change my views and the decision in the Hawley Case on this point.

██ Defendant also makes the point that plaintiff's conduct proves that it is against resharpening and reconditioning its razor blades and directs attention to the fact that plaintiff's blades are marked: "No honing—No stropping." From the evidence it is clear that plaintiff has discontinued printing the legend, "No honing—No stropping," on its blades with the advent of the Thompson and Smith blade of the patent in suit. Whatever may have been the conduct and policy of the plaintiff prior to the invention claimed in the patent in suit is immaterial as far as the issue here is concerned, just as much as it is immaterial what the conduct and policy of the defendant was prior to its infringement of the patent here in suit. Nor is the situation in any way affected by statements in the early Gillette patent, No. 775,134, or subsequent patents of the plaintiff with reference to the intended life of a razor blade, or any other statement, because such statements were made prior to the Thompson and Smith invention and can have no binding force now. Nor are any statements of plaintiff's officers regarding its policy as to the blade renewal business or its razor frames in point.

### Recapitulation.

The issues to be determined in this suit may be summarized in three questions. They are:

1. Is the Thompson and Smith patent valid?

2. Are defendant's blades, Plaintiff's Exhibits 6 and 7, infringements of claims 7, 8, 9, and 11 of the patent in suit?

. 3. Are defendant's blades, Plaintiff's Exhibits 6 and 7, contributory infringements of claims 1, 4, and 5 of the patent in suit?

For the reasons given and upon the authorities cited herein as well as those found in the Hawley Case, all three questions are answered in the affirmative.

Having thus expressed my conclusions of law and fact, it follows that claims 1, 4, 5, 7, 8, 9, and 11 of the Thompson and Smith patent are valid and infringed. There may accordingly be a decree for the plaintiff in accordance with the prayer for relief together with costs to abide the event.

Submit decree accordingly properly consented to as to form.